UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DEBORA BAYNE, and all other persons similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NAPW, INC. *d/b/a* National Association of Professional Women and *d/b/a* International Association of Women, and PROFESSIONAL DIVERSITY NETWORK, INC. *d/b/a* National Association of Professional Women and *d/b/a* International Association of Women,<br><br>Defendants. | Docket No.:<br>18-cv-3591(MKB)(RER)<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL FACTS** |

Pursuant to Local Rule 56.1, Plaintiffs provide the following Counterstatement to Defendants' Statement of Additional Facts, in further support of Plaintiffs' Motion for Partial Summary Judgment:

## DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS

### PDN Background

1. PDN has independently operated since 2011. Its main office, located in Chicago, Illinois, employs personnel consisting of accounting, finance, human resources, technology, customer service and customer relations. Pl. SMF, Ex. J, Dep. Bzdyl, pp. 7:9-12; 17:25-18:9.

**Plaintiffs' Response:** Admit that PDN's main office is located in Chicago, Illinois and employs personnel consisting of accounting, finance, human resources, technology, customer service and customer relations, but deny that "PDN has independently operated since 2011." The cited material does not support this statement and should be stricken. Further deny to the extent that Defendants are claiming that PDN and NAPW are not a single integrated enterprise and/or joint employers. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

2. In 2014, PDN purchased the assets of NAPW. The purchase did not materially change the operating or organizational structure of NAPW. Pl. SMF, Ex. J, Dep. Bzdyl, p. 7:7-16.

**Plaintiffs' Response:** Deny. In 2014, PDN created a wholly owned subsidiary "NAPW Merger Sub, Inc." that merged with NAPW, Inc. ("Old NAPW") and accepted all of Old NAPW's assets and liabilities. [Plaintiffs' Ex. P, PDN 2017 Form 10-K, at PL 442, "In September 2014 we acquired the NAPW Network through a merger of NAPW, Inc., a New York corporation ("Old NAPW") with and into NAPW Merger Sub, Inc., a Delaware corporation and our wholly-owned subsidiary ("Merger Sub"). Upon the closing of the merger under the Agreement and Plan of Merger, between Merger Sub, Old NAPW and Matthew B. Proman, the sole shareholder of Old NAPW, dated July 11, 2014 (the "Merger Agreement"), Old NAPW ceased to exist and Merger Sub continued as the surviving corporation, and a wholly-owned subsidiary of the Company, which was renamed to NAPW, Inc.] Further, the cited material does not support the statement that "[t]he purchase did not materially change the operating or organization structure of NAPW," and should be stricken.

**PDN Board and Relevant Changes**

3. In 2014, the PDN's post-merger Board consisted of Chief Executive Officer, James Kirsch ("Kirsch"); President and Director, Star Jones ("Jones"); Executive Vice President, Chief Operating Officer, Director, and Chief Executive Officer for NAPW, Matthew Proman ("Proman"); Chief Financial Officer, David Mecklenburger ("Mecklenburger"); Executive Vice President, General Counsel and Secretary, Christopher Wesser ("Wesser"); Chief Technology Officer, Chad Hoerstein ("Hoerstein"); Chief Revenue Officer, Daniel Sullivan ("Sullivan"); Executive Vice President, John Michael Hall ("Hall"); and Executive Vice President, Jorge Perez Izquierdo ("Izquierdo"). Pl. SMF, Ex. L, PDN 2014 Form 10-K, PL 309.

**Plaintiffs' Response:** Deny that Matthew Proman was Executive Vice President, Chief Operating Officer, Director, and Chief Executive Officer "*for NAPW*." The cited material does not specify NAPW and instead supports that he holds those titles for PDN. [*See* Ex. L, PDN 2014 Form 10-K, PL 309; *see also* PL 249 and PL 251 with PDN referring to Matthew Proman as "our" Chief Operating Officer; PL 256 listing Matthew Proman as Executive Vice President, Chief Operating Officer and Director of PDN; PL 300 stating that Proman will serve as PDN's Executive Vice President, Chief Operating Officer and Director.]

Further deny that Christopher Wesser was Executive Vice President, General Counsel and Secretary, that Chad Hoerstein was Chief Technology Officer, that Daniel Sullivan was Chief Revenue Officer, that John Michael Hall was Executive Vice President, or that Jorge Perez Izquierdo was Executive Vice President. [*See* Ex. L, PDN 2014 Form 10-K, PL 309, not listing any of these individuals.] The cited material does not support this statement and should be stricken.

Admit that in 2014 James Kirsch was the Chief Executive Officer, Star Jones was President and Director, David Mecklenburger was Chief Financial Officer.

4. Following the merger, Mr. Proman was appointed to the role of PDN Executive Vice President, Chief Operating Officer and Director for PDN. Id.

**Plaintiffs' Response:** Admit.

5. Mr. Proman "was never involved in operational decision-making with PDN." Pl. SMF, Ex. J, Dep. Bzdyl, pp. 135-137. Mr. Proman's primary responsibilities related to Chief Executive Officer of NAPW included the day to day operational leadership of NAPW's sales, technology, and marketing functions. Id.; Pl. SMF, Ex. L, PDN 2014 Form 10-K, PL 257.

**Plaintiffs' Response:** Deny that Mr. Proman was never involved in operational decision-making with PDN. [Ex. L, PDN 2014 Form 10-K, PL 249, "We are highly dependent on our

management and other key employees, including our Chief Executive Officer, Jim Kirsch, our Vice President and Chief Operating Officer, Matthew B. Proman, and our President, Star Jones. The skills, knowledge and experience of these individuals, as well as other members of our management team, are critical to the growth of the Company."; PL 251, "Our directors and executive officers and their affiliated entities, in the aggregate, beneficially own approximately 64.4% of our outstanding common stock. In particular, Mr. Proman, our Executive Vice President and Chief Operating Officer, who beneficially owns approximately 40.1%, together with Mr. Kirsch, our Chairman and Chief Executive Officer, and Star Jones, our President, beneficially own approximately 58.3% in the aggregate of our outstanding common stock, and are able to control or influence significantly all matters requiring approval by our stockholders, including the election of directors."]

Further deny that "Mr. Proman's primary responsibilities related to Chief Executive Officer of NAPW included the day to day operational leadership of NAPW's sales, technology, and marketing functions." The cited material does not support that statement and it should be stricken. Rather, the cited material supports that Mr. Proman's "'hands-on' entrepreneurial approach at the Company's NAPW subsidiary *includes* his day-to-day operational leadership of NAPW's sales, technology, and marketing functions." [Ex. L, PDN 2014 Form 10-K, PL 257.]

6. During the relevant period, Mr. Proman's primary responsibilities related to execution as Chief Executive Officer of NAPW, which included the day to day operational leadership of NAPW's sales, technology, and marketing functions. Id.

**Plaintiffs' Response:** Deny. The cited material does not support that these were Mr. Proman's "primary responsibilities" and that statement should be stricken. Rather, the cited material supports that Mr. Proman's "'hands-on' entrepreneurial approach at the Company's

NAPW subsidiary *includes* his day-to-day operational leadership of NAPW's sales, technology, and marketing functions." [Ex. L, PDN 2014 Form 10-K, PL 257.]

7. In 2015, PDN's Board consisted of Executive Chairman, Mr. Kirsch; Director, Donna Brazile ("Brazile"); Director, Barry Feierstein ("Feierstein"), President and Director; Ms. Jones; Director, Daniel Marovitz ("Marovitz"); Director, Stephen Pemberton ("Pemberton"); Director, Andrea Saenz ("Saenz"); Director, Randi Zuckerberg ("Zuckerberg"); Chief Financial Officer, Mr. Meckenburger; and Executive Vice President, General Counsel and Secretary, Mr. Wesser. Pl. SMF, Ex. M, PDN 2015 Form 10-K, PL 408-418.

**Plaintiffs' Response:** Admit.

8. From July 11, 2014 through July 16, 2015, Mr. Proman served as NAPW's Chief Executive Officer. Pl. SMF, Ex. P, PDN 2017 Form 10-K, PL 480.

**Plaintiffs' Response:** Deny. The material cited does not support this statement, other than that Mr. Proman entered into a Separation Agreement and Mutual Release of All Claims dated July 16, 2015.

9. On July 16, 2015, Mr. Proman entered into a Separation Agreement and Mutual Release of all Claims. Afterwards, Mr. Proman maintained no roles within PDN or NAPW. Pl. SMF, Ex. P, PDN 2017 Form 10-K, PL 480.

**Plaintiffs' Response:** Admit that on July 16, 2015, Mr. Proman entered into a Separation Agreement and Mutual Release of all Claims but deny that the cited material supports that Mr. Proman maintained no roles within PDN or NAPW and that portion should be stricken. [Ex. P, PDN 2017 Form 10-K, PL 480.]

10. On or around September 2015, Mr. Feierstein stepped down from all committees for PDN. Pl. SMF, Ex. M, PDN 2015 Form 10-K, PL 416.

**Plaintiffs' Response:** Admit.

11. On or about 2015, Mr. Wesser stepped down from all committees for PDN. Pl. SMF, Ex. M, PDN 2015 Form 10-K, PL 399-400.

**Plaintiffs' Response:** Deny. The cited material does not support this statement and should be stricken.

12. In 2016, PDN's Board consisted of Executive Chairman, Mr. Kirsch; Director, Ms. Brazile; Director, Mr. Feierstein; President and Director; Ms. Jones; Director, Mr. Marovitz; Director, Mr. Pemberton; Director, Ms. Saenz; Chief Financial Officer, Mr. Mecklenburger; and NAPW Chief Executive Officer, Katherine Butkevich ("Butkevich"). Pl. SMF, Ex. M, PL 408-418.

**Plaintiffs' Response:** Deny that Katherine Butkevich was the NAPW Chief Executive Officer. The cited material does not support that statement and it should be stricken. Rather, the cited material supports that Katherine Butkevich was the Chief Executive Officer of PDN. [Ex. M, PDN 2015 Form 10-K, PL 411-412.] Butkevich was the CEO of PDN from March 2016 to December 2016 and then in December 2016 Butkevich was hired as the CEO of NAPW. [Ex. M, PDN 2015 Form 10-K at PL 412; Ex. O, PDN 2016 Form 10-K at PL 101].

Admit that in 2016 Mr. Kirsch was PDN's Executive Chairman, that Ms. Brazile was a PDN Director, that Mr. Feierstein was a PDN Director, that Ms. Jones was a PDN President and Director, that Mr. Marovitz was a PDN Director, that Mr. Pemberton was a PDN Director, that Ms. Saenz was a PDN Director, and that Mr. Mecklenburger was PDN's Chief Financial Officer.

13. Ms. Butkevich was appointed as Chief Executive Officer on March 30, 2016. Pl. SMF, Ex. M, PL 412. Prior to her appointment, Ms. Butkevich served as a consultant to NAPW since

January 2016, helping optimize NAPW's operations, analyze the market opportunity and build a strategic plan for sustainable and profitable growth and increased member retention. Id.

**Plaintiffs' Response:** Admit, except clarify that Butkevich was appointed CEO of **PDN** in March 2016. [Ex. M, PDN 2015 Form 10-K at PL 412; Ex. O, PDN 2016 Form 10-K at PL 101].

14. In 2017, PDN's Board consisted of Chief Executive Officer and Chairman, Maoji Wang ("Wang"); Chief Financial Officer, Jianping Xiao ("Xiao"); President and Director, Ms. Jones; Executive Co-Chair and Director, Mr. Kirsch; Executive Co-Director and Director James Song ("Song"); Director, Tammy Huang ("Huang"); Director, Hao Zhang ("Zhang"); Director, Scott Liu ("Liu"); Director, David Schramm ("Schramm"); and Director, Lee Hillman ("Hillman"). Pl. SMF, Ex. O, PDN 2016 Form 10-K, PL 109-110; Ex. P, PDN 2017 Form 10-K, PL 506; 516-571.

**Plaintiffs' Response:** Admit.

15. On March 7, 2017, Mr. Xiao entered into an employment agreement to become PDN's new Chief Financial Officer. Pl. SMF, Ex. P, PDN 2017 Form 10-K, PL 506.

**Plaintiffs' Response:** Admit.

16. On September 18, 2017, Ms. Butkevich, Chief Executive Officer of the Company's wholly-owned subsidiary, NAPW, Inc., announced her resignation. Id.

**Plaintiffs' Response:** Admit that Ms. Butkevich notified PDN that was she resigning her employment effective September 18, 2017, but deny that Ms. Butkevich was Chief Executive Officer of NAPW. The cited material does not support that statement and it should be stricken. Rather, the cited material supports that Katherine Butkevich was *formerly* the Chief Executive Officer of NAPW. [Ex. P, PDN 2017 Form 10-K, PL 506.]

17. On September 24, 2017, Mr. Wesser's employment contract expired. Pl. SMF, Ex. P, PDN 2017 Form 10-K, PL 506-507.

**Plaintiffs' Response:** Admit.

18. In 2018, PDN's Board consisted of Chief Executive Officer and Chairman, Mr. Wang, Chief Financial Officer, Mr. Xiao; President and Director, Ms. Jones; Executive Co-Chair and Director, Mr. Kirsch; Executive Co-Chair and Director, Mr. Song; Director, Adam He ("He"); Director, Mr. Zhang; Director, Mr. Liu; and Director, Michael Belsky ("Belsky"). Pl. SMF, Ex. P, PL 516-517.

**Plaintiffs' Response:** Admit.

19. On March 6, 2018, Mr. Kirsch provided his intent to resign as Co-Executive Chairman. Pl. SMF, Ex. P, PDN 2017 Form 10-K, PL 515.

**Plaintiffs' Response:** Admit.


**PDN Business Operations**

20. PDN and NAPW are distinct companies with distinct goals and client bases. Pl. SMF, Ex. L, PDN 2014 Form 10-K, PL 231-232.

**Plaintiffs' Response:** Deny. The cited material does not support this statement and should be stricken. Since September 2014, PDN operated the National Association of Professional Women and the International Association of Women. [Ex. B, Defendants' Answer, ¶ 13; Ex. F, Mortillaro Decl. Ex. 5 at "Plaintiff Mortillaro 0802"]. PDN was "both the operator of the Professional Diversity Network (the 'PDN Network,' . . . ) and a holding company for NAPW, Inc., a wholly-owned subsidiary of [PDN] and the operator or the National Association of

Professional Women (the 'NAPW Network; or 'NAPW') . . . ." [Ex. L, PDN 2014 Form 10-K, at PL 284].

21. All business accounts and financials are separate, with revenues, gains and losses itemized and separated by parent and subsidiary. See generally, Pl. SMF, Ex. L, PDN 2014 Form 10-K; Ex. M, PDN 2015 Form 10-K; Ex. P, PDN 2016 Form 10-K; Ex. JJ, PDN 2019 Form 10-K.

**Plaintiffs' Response:** Deny. The cited material does not support this statement and should be stricken. Rather, the cited material supports that PDN considered its revenues and losses together. [*See e.g.*, Ex. P, PDN 2017 Form 10-K PL 460 – 461, counting revenue from NAPW's paid membership subscription and related services, Noble Voice's lead generation, PDN's recruitment services, etc…as part of PDN's "sources of revenue."; PL 468, table calculating the "consolidated net loss" of NAPW, PDN, Noble Voice, etc…]

22. Prior to and subsequent to the merger, PDN and NAPW maintained separate compensation structures and policies. Pl. SMF, Ex. J, Dep. Bzdyl, p. 96:18–100:21, see also NAPW Employee Handbook, attached as Exhibit 9 to Deposition Transcript of Joseph Bzdyl, attached as Defendants Exhibit A.

**Plaintiffs' Response:** Deny. The cited material does not address PDN's compensation structure and does support this statement and should be stricken. NAPW's compensation structure was dictated by PDN after the merger. [Ex. E, Farris Decl. at Ex. 3 ("PDN 401k PLAN") and Ex. 4, 1095-C tax form ("Employer-Provided Health Insurance Offer and Coverage"); Ex. F, Mortillaro Decl. at Ex. 5, "Plaintiff Mortillaro 0802"; Ex. J, Bzdyl Dep., pp. 150:5-151:18 (PDN provided healthcare to NAPW employees); Ex. M, PDN 2015 Form 10-K, at PL 350 (PDN modified commission structure and managed sales leads)].

23. PDN does not employ non-exempt employees, i.e. personnel who are required to record their own time. PDN Answers to Interrogatories No. 5, attached as Defendants Exhibit B.

**Plaintiffs' Response:** Deny. Defendants incorrectly define the legal term "non-exempt employees." Further deny to the extent that Defendants are claiming that PDN and NAPW are not a single integrated enterprise and/or joint employers, and that Plaintiffs were exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

24. PDN was not involved, nor controlled any aspect of NAPW's hiring process. Pl. SMF, Ex J, Dep. Bzdyl, p. 54:17-24.

**Plaintiffs' Response:** Deny. The cited material does not support this statement and should be stricken. Defendants' joint answer admits that "[NAPW and PDN] possessed hiring and firing power and maintained control over Bayne's work." [Ex. B, Defendants' Joint Answer, ¶ 59]. Joseph Bzdyl, the Executive Vice President of PDN, testified that he "was nominated by the former CEO to oversee certain aspects and ensure hiring [at NAPW] was in line with strategies." [*Id*. at p. 57:1-11.] PDN exhibited control over staffing levels for NAPW sales representatives. [Ex. F, Mortillaro Decl. at Ex. 5 ("[t]he PDN Executive Team has agreed to . . . keep the numbers of sales reps where it is today."); Ex. J, Bdzyl Dep., p. 183:10-16 (Bdzyl testified that it is possible that Kirsch "was involved in decision-making about overall staffing level" at NAPW)]. At the direction of PDN's CEO, Bzdyl traveled to NAPW's Garden City office to lay off approximately 30 to 40 NAPW sales representatives in 2017. [*Id*. at pp. 23:1 – 25:7]. Bzdyl conducted layoffs of NAPW sales representatives remotely in 2019. [*Id*.]. PDN also "made numerous changes to the sales and marketing structure within [NAPW] . . ." including "(2) reducing the number of sales representatives." [Ex. M, PDN 2015 Form 10-K, at PL 350]. A memorandum was issued to

NAPW's sales representatives stated, "[t]omorrow, we will be meeting with all employees to provide an update on our merger with Professional Diversity Network. ***Part of the merger process is to formally hire each of you as a PDN employee***. This will become effective immediately, as discussed in the welcome letter from our CEO, Jim Kirsch, along with Matt and Star." [Ex. F, Mortillaro Decl. Ex. 3 at "Plaintiff Mortillaro 0795" (emphasis added)].

Further deny to the extent that Defendants are claiming that PDN and NAPW are not a single integrated enterprise and/or joint employers, and that Plaintiffs were exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

25. PDN was not involved, nor set the rates of pay for NAPW membership sales representatives, nor did the organization track the work performed by the NAPW membership sales representatives. Def SAMF, Ex. B, PDN Answers to Interr. Nos. 2, 17.

**Plaintiffs' Response:** Deny. PDN modified Plaintiffs' commission structures and sales leads. [Ex. M, PDN 2015 Form 10-K, at PL 350; Ex. F, Mortillaro Decl. at Ex. 5, "Plaintiff Mortillaro 0802"]. Joseph Bdzyl, the Executive Vice President of PDN, was the administrator for NAPW's payroll account. [Ex. J, Bdzyl Dep. pp. 148-149]. For two years prior to Bdzyl's 2020 deposition, he would view NAPW's payroll reports. [*Id.*, pp. 144:5-146:8]. Plaintiffs met with Chris Wesser, the Executive Vice President, General Counsel and Secretary for PDN, and Barry Feierstein, a member on PDN's Board of Directors to discuss various workplace issues, including, but not limited to, sales quotas and the compensation structure. [Ex. F, Mortillaro Decl. ¶ 27 and Exs. 6-7; Ex.G, Tsimicalis Decl. ¶ 18; Ex. D, Dotson Decl. ¶¶ 16-17; Ex. H, Hoffman Decl. ¶ 16]. NAPW used a Customer Relations Management ("CRM") database and interface system to manage sales and track the time worked by Plaintiffs, which was upgraded by PDN after the

merger using technology created by PDN's subsidiary Noble Voice. [Ex. M, PDN 2015 Form 10-K, at PL 326; Ex. C, Bayne Decl., ¶ 17].

26. PDN did not track work performed by employees of NAPW. Sales reports for its own salespersons are maintained on the company's Customer Relations Management system, Hubspot. Data from the CRM system is transferred to spreadsheets from which commissions are calculated. Def. SAMF, Ex. B, PDN Ans. to Interr. No. 17.

**Plaintiffs' Response:** Deny. PDN modified Plaintiffs' commission structures and sales leads. [Ex. M, PDN 2015 Form 10-K, at PL 350; Ex. F, Mortillaro Decl. at Ex. 5, "Plaintiff Mortillaro 0802"]. Joseph Bdzyl, the Executive Vice President of PDN, was the administrator for NAPW's payroll account. [Ex. J, Bdzyl Dep. pp. 148-149]. For two years prior to Bdzyl's 2020 deposition, he would view NAPW's payroll reports. [*Id.*, pp. 144:5-146:8]. Plaintiffs met with Chris Wesser, the Executive Vice President, General Counsel and Secretary for PDN, and Barry Feierstein, a member on PDN's Board of Directors to discuss various workplace issues, including, but not limited to, sales quotas and the compensation structure. [Ex. F, Mortillaro Decl. ¶ 27 and Exs. 6-7; Ex. G, Tsimicalis Decl. ¶ 18; Ex. D, Dotson Decl. ¶¶ 16-17; Ex. H, Hoffman Decl. ¶ 16]. NAPW used a Customer Relations Management ("CRM") database and interface system to manage sales and track the time worked by Plaintiffs, which was upgraded by PDN after the merger using technology created by PDN's subsidiary Noble Voice. [Ex. M, PDN 2015 Form 10-K, at PL 326; Ex. C, Bayne Decl., ¶ 17].

## NAPW Business Operations

27. NAPW is a professional association and networking platform with a focus on diversity. NAPW is a wholly-owned and entirely operated separate subsidiary of PDN. Pl. SMF, Ex. J, Dep. Bzdyl, p. 7:3-6.

**Plaintiffs' Response:** Admit that NAPW is a professional association and networking platform, but deny that the cited material supports that it has a "focus on diversity," and this fact should be stricken.

Deny that NAPW is an "entirely operated separated subsidiary of PDN." NAPW is a wholly owned subsidiary of Defendant PDN. [Ex. B, Defendants' Joint Answer, ¶ 12]. Following the merger-acquisition in September 2014, PDN was "both the operator of the Professional Diversity Network (the 'PDN Network,' . . . ) and a holding company for NAPW, Inc., a wholly-owned subsidiary of [PDN] and *the operator of the National Association of Professional Women (the 'NAPW Network; or 'NAPW')* . . . ." [Ex. L, PDN 2014 Form 10-K, at PL 284]. Further deny to the extent that Defendants are claiming that PDN and NAPW are not a single integrated enterprise and/or joint employers. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

28. During the relevant period, NAPW operated primarily from its main office, located in Garden City, New York, where it employed personnel consisting of information technology, human resources, marketing, and sales departments. Pl. SMF, Ex. J, Dep. Bzdyl, pp. 26:18-27:17.

**Plaintiffs' Response:** Deny. The cited material does not support that NAPW's "main office" was "located in Garden City, New York," and should be stricken. The cited material states that, "NAPW's principal place of business" is "the PDN offices, 801 West Adams, Chicago" and has been since "mid 2018 or so." [Ex. J, Bzdyl Dep., p. 26:2-11.]

29. NAPW maintained their own Chief Executive Officer, Human Resources Director, Vice President of Operations, Network Administrator, Director of Sales, Director of Local Chapters, Sales Management and Leadership, and Hiring Managers. Pl. SMF, Ex. J, Dep. Bzdyl, pp. 42: 21-23; 45:1-6; 45:20-46:6; 46:14-17; 47:2-5; 48:15-17; 54:17-24; 56:1-11.

**Plaintiffs' Response:** Deny. The cited material does not support this statement should be stricken. The cited material does not ever reference a Chief Executive Officer, Vice President of Operations, Network Administrator, or Director of Sales. Mr. Bzdyl merely identified certain individuals as "manager for NAPW in their membership services team," "director or manager of local chapters at NAPW," "membership services," "sales management," "director of human resources for NAPW [at one point]," and "membership services representative for NAPW," and further vaguely mentions "hiring managers" that are unidentified.

30. NAPW's Chief Financial Officer maintained the authority to set rates of pay related to NAPW sales representatives. NAPW Answers to Interrogatories, No. 10, attached as Defendants Exhibit C.

**Plaintiffs' Response:** Admit that NAPW's Chief Financial Officer maintained authority to set rates of pay related to NAPW sales representatives, but deny to the extent Defendants are claiming this authority was possessed exclusively by NAPW's Chief Financial Officer or that Defendants are claiming that PDN and NAPW are not a single integrated enterprise and/or joint employers. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

31. NAPW maintained three versions of CRM: 2012-2015; 2015-2017; and 2017-2018. Pl. SMF, Ex. J, pp. 179:14-180-4; 181:6-9.

**Plaintiffs' Response:** Admit.

32. NAPW employed no fewer than three developers to support the CRM and maintain the CRM. Pl. SMF, Ex. J, Bdyzl Dep., pp. 88:12-16.

**Plaintiffs' Response:** Admit.

33. Plaintiffs were asked to clock in and out at the beginning and end of the workday. When NAPW implemented its CRM system, HubSpot, employees were required to log in to their computers before beginning work. Def SMAF, Ex. C, NAPW Ans. to Interr. No. 4.

**Plaintiffs' Response:** Deny. Plaintiffs performed work before logging in to the CRM system. [Defendants' Ex. F, Bayne Dep. p. 69:19-70:3; Defendants' Ex. L, Canas Dep. p. 21:13-18] Further deny to the extent that Defendants are alleging that the CRM logs tracked all hours worked. [*Id*; Defendants' Ex. K, Harris Dep. 47:8-19]

34. NAPW employees are generally aware of the company's pay practices and policies regarding overtime, including the strict instruction that employees were/are not permitted to work overtime without prior authorization and/or written approval. Employees were routinely reminded of this policy, which the company enforces. Pl. SMF. Ex. J, Dep. Bzdyl, pp. 101:19-102:16; 166:7-15.

**Plaintiffs' Response:** Deny.  The cited material only supports a finding that it was NAPW's policy that overtime was not permitted without written authorization. Nothing in the cited portion supports: when this policy was communicated, how frequently it was communicated, or how it was implemented. Accordingly, this statement should be stricken.

35. NAPW determined the rates of pay for membership sales representatives. Def. SAMF, Ex. C, NAPW Ans. to Interr. No. 3.

**Plaintiffs' Response:** Admit that NAPW determined the rates of pay for membership sales representatives, but deny to the extent that Defendants are claiming that this pertains exclusively to NAPW and not PDN. PDN "made numerous changes to the sales and marketing structure within [NAPW] in order to balance out profits and losses and establish a pathway to profitability in future periods." [Ex. M, PDN 2015 Form 10-K, at PL 350]. These "changes" included "(3) modifying

commission structures," [*Id.*]. The 2018 commission agreement for NAPW's sales representatives explicitly identifies PDN as a corporate party to the agreement. [Ex. T, Sales Associate Commission Agreement at "NAPW 5044-5048" ("This Commission Agreement . . . is entered into between Professional Diversity Network, Inc., including its subsidiary NAPW, Inc. and its brand International Association of Women ("IAW") . . . ."); Ex. J, Bdzyl Dep. p. 104:3-10]. The commission agreement outlines all the essential terms of employment for NAPW's sales representatives. [Ex. T, Sales Associate Commission Agreement at "NAPW 5044-5048"]. PDN is the only corporate entity listed on the signature line of the commission agreement. [*Id.* at "NAPW 5048" (NAPW is omitted)]. David Mecklenburger, Chief Financial Officer for PDN, signed checks issued by NAPW to NAPW's sales representatives. [Ex. H, Hoffman Decl. at Ex. 1, check dated May 1, 2015].

36. NAPW maintained its own payroll adjustment forms. NAPW 04263, attached as Defendants Exhibit D.

**Plaintiffs' Response:** Admit that the document attached as Exhibit D is a payroll adjustment form with NAPW's logo on top, and otherwise denied. NAPW is both the name of the corporate entity and the produce (*i.e.*, the networking organization operated by NAPW and PDN). [Pl. SMF ¶¶ 26-27.] Nothing in the exhibit cited by Defendants suggests the corporate entity and Defendant NAPW, Inc., as opposed to Defendant PDN, "maintained" this payroll adjustment form. Defendants could have, but do not, cite to any witness with knowledge of who maintained this specific record. The evidence in the record suggests that even though an employment record contains the name NAPW or IAW, that does not mean it is maintained by Defendant NAPW, Inc. [See Newhouse Reply Decl., Ex. MM, Dotson Reply Decl. at Ex. 1 (e-mail from PDN's Human Resources communicating "IAW's PTO policy & Updates")]. In addition, NAPW did not always

maintain its own employment records. [Ex. J, Bdzyl Dep., p. 26:2-11, 100:17-25 (after NAPW's Garden City office was closed in mid-2018, NAPW's employee files were "boxed and shipped [from the Garden City office] to the Chicago office.").]

37. NAPW maintained its own PTO policy. NAPW 05040-05042, attached as Defendants Exhibit E.

**Plaintiffs' Response:** Denied. Nothing in the exhibit suggests NAPW maintained its own PTO policy, and thus, must be stricken. The only identifying information in the exhibit is the IAW logo. IAW is a brand name for the networking organization operated by NAPW and PDN. [Pl. SMF ¶¶ 26-27.] Nothing in the exhibit cited by Defendants suggests the corporate entity and Defendant NAPW, Inc., as opposed to Defendant PDN, "maintained" this PTO Policy. Defendants could have, but do not, cite to any witness with knowledge of who maintained NAPW's PTO policy. To the contrary, NAPW's PTO policy was maintained by PDN. [See Ex. MM, Dotson Reply Decl. at Ex. 1 (e-mail from PDN's Human Resources communicating "IAW's PTO policy & Updates")].

38. NAPW was responsible for the hiring of membership sales representatives, which was conducted by NAPW managers and human resources personnel. Applicants would apply via NAPW job postings, most commonly found on online forums. Pl. SMF, Ex. J, Dep. Bzdyl, pp. 54:17-24; 55:11-56:11.

**Plaintiffs' Response:** Deny to the extent that Defendants are claiming that this pertains exclusively to NAPW and not PDN. Defendants' joint answer admits that "[NAPW and PDN] possessed hiring and firing power and maintained control over Bayne's work." [Ex. B, Defendants' Joint Answer, ¶ 59]. Joseph Bzdyl, the Executive Vice President of PDN, testified that he "was nominated by the former CEO to oversee certain aspects and ensure hiring [at NAPW] was in line

with strategies." [*Id*. at p. 57:1-11.] PDN exhibited control over staffing levels for NAPW sales representatives. [Ex. F, Mortillaro Decl. at Ex. 5 ("[t]he PDN Executive Team has agreed to . . . keep the numbers of sales reps where it is today."); Ex. J, Bdzyl Dep., p. 183:10- 16 (Bdzyl testified that it is possible that Kirsch "was involved in decision-making about overall staffing level" at NAPW)]. At the direction of PDN's CEO, Bdzyl traveled to NAPW's Garden City office to lay off approximately 30 to 40 NAPW sales representatives in 2017. [*Id*. pp. 23:1 – 25:7]. Bdzyl conducted layoffs of NAPW sales representatives remotely in 2019. [*Id*.]. PDN also "made numerous changes to the sales and marketing structure within [NAPW] . . ." including "(2) reducing the number of sales representatives." [Plaintiffs' Ex. M, PDN 2015 Form 10-K, at PL 350]. A memorandum was issued to NAPW's sales representatives stated, "[t]omorrow, we will be meeting with all employees to provide an update on our merger with Professional Diversity Network. ***Part of the merger process is to formally hire each of you as a PDN employee***. This will become effective immediately, as discussed in the welcome letter from our CEO, Jim Kirsch, along with Matt and Star." [Ex. F, Mortillaro Decl. Ex. 3 at "Plaintiff Mortillaro 0795" (emphasis added)].

39. NAPW hiring and sales managers were responsible for all hiring decisions. Pl. SMF, Ex. J, Dep. Bzdyl, p. 56:7:11.

**Plaintiffs' Response:** Deny to the extent that Defendants are claiming that this pertains exclusively to NAPW and not PDN. Defendants' joint answer admits that "[NAPW and PDN] possessed hiring and firing power and maintained control over Bayne's work." [Ex. B, Defendants' Joint Answer, ¶ 59]. Joseph Bzdyl, the Executive Vice President of PDN, testified that he "was nominated by the former CEO to oversee certain aspects and ensure hiring [at NAPW] was in line with strategies." [*Id*. at p. 57:1-11.] PDN exhibited control over staffing levels for NAPW sales

representatives. [Ex. F, Mortillaro Decl. at Ex. 5 ("[t]he PDN Executive Team has agreed to . . . keep the numbers of sales reps where it is today."); Ex. J, Bdzyl Dep., p. 183:10-16 (Bdzyl testified that it is possible that Kirsch "was involved in decision-making about overall staffing level" at NAPW)]. At the direction of PDN's CEO, Bdzyl traveled to NAPW's Garden City office to lay off approximately 30 to 40 NAPW sales representatives in 2017. [*Id*. pp. 23:1 – 25:7]. Bdzyl conducted layoffs of NAPW sales representatives remotely in 2019. [*Id*.]. PDN also "made numerous changes to the sales and marketing structure within [NAPW] . . ." including "(2) reducing the number of sales representatives." [Plaintiffs' Ex. M, PDN 2015 Form 10-K, at PL 350]. A memorandum was issued to NAPW's sales representatives stated, "[t]omorrow, we will be meeting with all employees to provide an update on our merger with Professional Diversity Network. ***Part of the merger process is to formally hire each of you as a PDN employee***. This will become effective immediately, as discussed in the welcome letter from our CEO, Jim Kirsch, along with Matt and Star." [Ex. F, Mortillaro Decl. Ex. 3 at "Plaintiff Mortillaro 0795" (emphasis added)].

40. NAPW conducted its own hires and termination, whereas PDN was solely involved in tracking employee head count. Pl. SMF, Ex. J, Dep. Bzdyl, pp. 26:18-27:17.

**Plaintiffs' Response:** Deny. The cited material does not support this statement and should be stricken.

41. NAPW was also responsible for the day-to-day responsibilities and schedule of membership sales representatives. NAPW enforced its own policies within its workplace, which applied uniformly to the membership sales representatives. Def. SAMF, Ex. A, Employee Handbook.

**Plaintiffs' Response:** Deny to the extent that Defendants are claiming that this pertains exclusively to NAPW and not PDN. PDN was responsible for setting the NAPW holiday schedule. [Ex. S, NAPW Sales Personnel Policies, at "NAPW 004148" (stating that "PDN is currently harmonizing the 2015 company holiday schedule, which differs from year to year. Employees will be given this year's schedule during January 2015.")]. PDN was responsible for the healthcare coverage issued to NAPW's sales representatives. [Ex. J, Bdzyl Dep., pp. 150:5-151:18; *see also* Ex. F, Farris Decl. at Ex. 4, 1095-C tax form ("Employer-Provided Health Insurance Offer and Coverage")]. With respect to NAPW, Bdzyl testified that his job was to "oversee overall business performance and help the operations team there make decisions for the business" and "the VP of operations at NAPW reports to me, and then we discuss the directions of various projects or business performance or decisions within that – within that entity." [Ex. J, Bdzyl Dep., at pp. 13:18-14:2]. Bdzyl was responsible for NAPW's human resources responsibilities since August 2019, including being the administrator for NAPW's payroll account. [*Id.* at p. 148-149]. PDN's executive officers and members of its Board of Directors were responsible for addressing workplace issues for NAPW's sales representatives. [Ex. F, Mortillaro Decl., ¶¶ 24-27 and Ex. 5; Ex. G, Tsimicalis Decl., ¶ 18; Ex. D, Dotson Decl., ¶¶ 16-18; Ex. H, Hoffman Decl., ¶ 16]. PDN encouraged NAPW sales representatives to discuss workplace issues with Chris Wesser, the Executive Vice President, General Counsel and Secretary for PDN. [Ex. F, Mortillaro Decl. at Ex. 5, "Plaintiff Mortillaro 0802"]. NAPW's sales representatives were told that workplace concerns and complaints should be made to Chris Wesser or Barry Feierstein, a member on PDN's Board of Directors. [*Id.* at ¶ 24; *see also Id.* at Ex. 5, "Plaintiff Mortillaro 0802"]. NAPW's sales representatives met with Wesser and Feierstein to discuss various workplace issues, including, but not limited to, sales quotas, issues with the CRM system, the method for distributing sales leads,

and the compensation structure. [Ex. F, Mortillaro Decl. ¶ 27 and Exs. 6-7; Ex. G, Tsimicalis Decl. ¶ 18; Ex. D, Dotson Decl. ¶¶ 16-17; Ex. H, Hoffman Decl. ¶ 16]. PDN provided NAPW sales representative with a direct hotline to call if they had any workplace issues. [Ex. E, Farris Decl., Ex. 2 and ¶¶ 17-18; *see also* Ex. F, Mortillaro Decl., ¶¶ 22-23; Ex. C, Bayne Decl., ¶ 18; Ex. D, Dotson Decl., ¶ 18].

42. Schedules of NAPW personnel were created by their respective sales managers. Def. SAMF, Ex. C NAPW Ans. to Interr No. 11.

**Plaintiffs' Response:** Admit.

43. NAPW employed numerous membership sales representatives who were responsible for communicating with potential NAPW members in an effort to sell memberships. Def. SAMF, Ex. C, NAPW Ans. to Interr. No. 3.

**Plaintiffs' Response:** Admit that NAPW employed numerous membership sales representatives who were responsible for communicating with potential NAPW members in an effort to sell memberships, but deny only to the extent that Defendants are claiming that PDN and NAPW are not a single integrated enterprise and/or joint employers, and that Plaintiffs were exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

44. NAPW provided membership sales representatives with leads for potential new members. Transcript of Deposition Transcript of Deborah Bayne, p. 39:11-14, attached as Defendants Exhibit F.

**Plaintiffs' Response:** Admit that NAPW provided membership sales representatives with leads for potential new members, but deny to the extent that Defendants are claiming that this pertains exclusively to NAPW and not PDN. PDN managed NAPW's sales representatives sales

leads. [Ex. M, PDN 2015 Form 10-K, at PL 350]. NAPW's sales representatives met with PDN executives to discuss various workplace issues, including, but not limited to, sales quotas, issues with the CRM system, the method for distributing sales leads, and the compensation structure. [Ex. F, Mortillaro Decl. ¶ 27 and Exs. 6-7; Ex. G, Tsimicalis Decl. ¶ 18; Ex. D, Dotson Decl. ¶¶ 16-17; Ex. H, Hoffman Decl. ¶ 16].

45. NAPW provided membership sales representatives with scripts, sales training, and NAPW email addresses to communicate with potential members. Declaration of Marie Bartolotti ¶ 12, attached as Defendants Exhibit G.

**Plaintiffs' Response:** Admit that NAPW provided membership sales representatives with scripts, sales training, and NAPW email addresses to communicate with potential members, but deny to the extent that Defendants are claiming that this pertains exclusively to NAPW and not PDN. PDN managed NAPW's sales representatives sales leads. [Ex. M, PDN 2015 Form 10-K, at PL 350]. NAPW's sales representatives met with PDN executives to discuss various workplace issues, including, but not limited to, sales quotas, issues with the CRM system, the method for distributing sales leads, and the compensation structure. [Ex. F, Mortillaro Decl. ¶ 27 and Exs. 6-7; Ex. G, Tsimicalis Decl. ¶ 18; Ex. D, Dotson Decl. ¶¶ 16-17; Ex. H, Hoffman Decl. ¶ 16].

**Collective and Class Members and Employment with NAPW**

46. Ms. Bayne applied for the position of Sales Representative for NAPW. Def SAMF, Ex. F, Dep. Bayne, p. 37:5-18.

**Plaintiffs' Response:** Admit that Plaintiff Bayne applied for the position of Sales Representative but deny to the extent that Defendants are claiming that Plaintiff Bayne was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

47. Ms. Farris applied for the position of Account Coordinator for NAPW. Transcript of Deposition of Melanie Farris Farris, pp. 39:11-40:6, attached as Defendants Exhibit H.

**Plaintiffs' Response:** Admit that Plaintiff Farris applied for the position of Account Coordinator but deny to the extent that Defendants are claiming that Plaintiff Farris was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

48. Amy Bourassa ("Bourassa") applied for the position of Sales Representative for NAPW. Transcript of Deposition of Amy Bourassa, p. 15:13-25, attached as Defendants Exhibit I.

**Plaintiffs' Response:** Admit that Bourassa applied for a position of Sales Representative but deny to the extent that Defendants are claiming that Bourassa was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

49. Denise Baker ("Baker") applied for the position of Sales Representative for NAPW. Transcript of Deposition of Denise Baker, pp. 31:22-32:25, attached as Defendants Exhibit J.

**Plaintiffs' Response:** Admit that Baker applied for a "membership sales position" (Defendants' Ex. J, Deposition of Denise Baker, p. 32:25) but deny to the extent that Defendants are claiming that Baker was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

50. Kendra Harris ("Harris") applied for the position of Membership Sales Coordinator for NAPW. Transcript of Deposition of Kendra Harris, p. 26:11-23, attached as Defendants Exhibit K.

**Plaintiffs' Response:** Admit that Harris applied for a position of "membership sales coordinator" (Defendants' Ex. K, Deposition of Kendra Harris, p. 26:23) but deny to the extent that Defendants are claiming that Harris was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

51. Vanessa Canas ("Canas") applied for the position of Sales Representative for NAPW. Transcript of Deposition of Vanessa Canas, pp. 26:18-27:3, attached as Defendants Exhibit L.

**Plaintiffs' Response:** Admit that Canas applied for a position of Sales Representative but deny to the extent that Defendants are claiming that Canas was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

**Employment of Class and Collective Members**

52. Ms. Bayne was hired by NAPW as a Sales Representative in 2009. Ms. Bayne ceased coming into work as of January 18, 2018 and her employment ended on February 12, 2018. Def. SAMF, Ex. G, Dep. Bayne, pp. 38:15-21; 95:24-96:2; Def. SAMF, Ex. G, Decl. Bartolotti ¶¶ 17, 23.

**Plaintiffs' Response:** Admit that Plaintiff Bayne was hired as a Sales Representative in 2009 and that her employment ended in approximately February 2018 but deny to the extent that Defendants are claiming that Plaintiff Bayne was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.] Plaintiff Bayne also testified that PDN was her employer. [Defendants' Ex. F, Deposition of Deborah Bayne, p. 91:2-20.]

53. Ms. Farris was hired as an Account Coordinator for NAPW on February 1, 2010. Her employment ended on June 12, 2017. Def. SAMF, Ex. H, Dep. Farris, pp. 40:16-18; 46:8-14.

**Plaintiffs' Response:** Admit that Plaintiff Farris was hired as an Account Coordinator on or about February 1, 2010, and that her employment ended on or about June 12, 2017, but deny to the extent that Defendants are claiming that Farris was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

54. Ms. Bourassa was hired as a Sales Representative for NAPW in April of 2014. Her employment ended in January of 2016. Def. SAMF, Ex. I, Dep. Bourassa, pp. 15:10-12; 41:16-18.

**Plaintiffs' Response:** Admit that Bourassa was hired as a Sales Representative on or about April 2014 and that her employment ended on or about January 2016 but deny to the extent that Defendants are claiming that Bourassa was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

55. Ms. Baker was hired as a Sales Representative for NAPW on July 6, 2016. Her employment ended in October or November of 2016. Def. SAMF, Ex. J, Dep. Baker, pp. 7:1-6; 31:18-21.

**Plaintiffs' Response:** Admit that Baker was hired as a Sales Representative on or about July 2016 and that her employment ended on or about October or November 2016 but deny to the extent that Defendants are claiming that Baker was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

56. Ms. Harris was hired as a Sales Coordinator for NAPW in November of 2015. Her employment ended in October of 2016. Ex. K, Dep. Harris, pp. 25:22-26: 9.

**Plaintiffs' Response:** Admit that Harris was hired as a Sales Coordinator in November of 2015 and that her employment ended in October of 2016 but deny to the extent that Defendants are claiming that Harris was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

57. Ms. Canas was hired as a Sales Representative for NAPW in March of 2016. Her employment ended approximately four months later. Def SAMF, Ex. L, Dep. Canas, pp. 7:8-10; 25:22-24.

**Plaintiffs' Response:** Admit that Canas was hired as a Sales Coordinator in March 2016 and that her employment ended approximately four months later but deny to the extent that Defendants are claiming that Canas was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

**Employment Location of Class and Collective Members**

58. Throughout her employment, Ms. Bayne reported directly to NAPW's Garden City, New York location. Def. SAMF, Ex. F, Dep. Bayne, p. 84:5-25.

**Plaintiffs' Response:** Neither admit nor deny. The cited material does not support the statement made and should be stricken.

59. Throughout her employment, Ms. Farris reported directly to NAPW's Garden City, New York location. Def. SAMF, Ex. H, Dep. Farris, p. 50:2-23.

**Plaintiffs' Response:** Admit.

60. Throughout her employment, Ms. Bourassa reported to NAPW's Century City, California location. Def. SAMF, Ex. I, Dep. Bourassa, p. 16:14-22.

**Plaintiffs' Response:** Admit.

61. Ms. Baker did not report directly to a specific location, but worked from home during her employment. However, NAPW provided her with all equipment and resources to perform the duties of her position. Ex. J, Dep. Baker, p. 33:6-24.

**Plaintiffs' Response:** Admit.

62. Throughout her employment, Ms. Harris reported directly to NAPW's Garden City, New York location. Def. SAMF, Ex. K, Dep. Harris, p. 27:6-13.

**Plaintiffs' Response:** Admit.

63. Throughout her employment, Ms. Canas directly reported to NAPW's Garden City, New York location. Def. SAMF, Ex. L, Dep. Canas, p. 28:4-10.

**Plaintiffs' Response:** Admit.

**Training of Class and Collective Members**

64. Upon hire, Ms. Bayne participated in NAPW onboarding and training. Def SAMF, Ex. F, Dep. Bayne, p. 40:4-5, 11-13.

**Plaintiffs' Response:** Deny. The cited material does not support this statement and should be stricken. Plaintiff Bayne testified that no orientation was provided and that the only training provided was "practicing reading the script, that was the training" and that "[t]hey just threw you into the wolves. Sink or swim, that's how I can describe my time there." [Defendants' Ex. F, Bayne Dep., p. 40:9-41:8.]

65. Upon hire, Ms. Farris attended NAPW orientation, training, and was provided with a copy of the company policies, including an employee handbook. Def. SAMF, Ex. H, Dep. Farris, pp. 40:7-15; 42:1-19; 45:4-10.

**Plaintiffs' Response:** Admit.

66. Upon hire, Ms. Bourassa attended NAPW training an orientation. Ms. Bourassa reviewed company policies directly with the NAPW HR Director. Def. SAMF, Ex. I, Dep. Bourassa, pp. 24:3-9; 25:2-8.

**Plaintiffs' Response:** Admit.

67. Upon hire, Ms. Baker attended NAPW training and orientation and received a copy of the employee handbook. Def. SAMF, Ex. J, Dep. Baker p. 53:12-19.

**Plaintiffs' Response:** Admit.

68. Upon hire, Ms. Harris attended NAPW training and orientation. Def. SAMF, Ex. K, Dep. Harris, p. 42:20-24.

**Plaintiffs' Response:** Admit.

69. Upon hire, Ms. Canas attended NAPW training and orientation. Def. SAMF, Ex. L, Dep. Canas, p. 35:14-22.

**Plaintiffs' Response:** Admit.

**Clock in Procedures for Class Members**

70. Like other employees, Ms. Bayne was obligated to clock in and out each day. Def. SAMF, Ex. G, Decl. Bartolotti ¶ 18; Bayne Payroll Records attached as Defendants Exhibit M; Bayne Time Cards attached as Defendants Exhibit N.

**Plaintiffs' Response:** Deny. The cited material does not support that "[l]ike other employees Ms. Bayne was obligated" to clock in and out each day," and should be stricken.

Plaintiff Bayne testified that was "expected" to log in to her computer to "announce that she was at work and ready to work" and log out of her computer when she "departed for the day or shut off for the day[.]" [Defendants' Ex. F, Bayne Dep. 54:10-25.]

Bayne further testified to performing work before logging in to the CRM system. [Defendants' Ex. F, Bayne Dep. p. 69 :19-70 :3.] Further deny to the extent that Defendants are alleging that the CRM logs tracked all hours worked. [*Id*.]

71. Like other employees, Ms. Farris was obligated to clock in and out each day. Def. SAMF, Ex. H, Dep. Farris, pp. 47:22-48:2.

**Plaintiffs' Response:** Deny. The cited material does not support that "[l]ike other employees, Ms. Farris was obligated to clock in and out each day," and should be stricken. Farris testified that she "signal[ed] her workday began" by clocking in and was "expected" to clock out when her workday ended. [Defendants' Ex. H, Farris Dep., pp. 47:22-48:2.]

72. Like other employees, Ms. Bourassa understood the procedures to clock in and out each day. Def. SAMF, Ex. I, Dep. Bourassa, pp. 25:22-25; 27:11-18.

**Plaintiffs' Response:** Deny. The cited material does not support that "[l]ike other employees, Ms. Bourassa understood the procedures to clock in and out each day," and should be stricken. Bourassa testified that she "received training regarding the whole system and that included clocking in and clocking out." [PDN;s Ex. I, Bourassa Dep., pp. 25:22-25.]

73. Like other employees, Ms. Baker under understood the procedures to clock in and out each day. Def. SAMF, Ex. J, Dep. Baker, p. 46:3-13.

**Plaintiffs' Response:** Deny. The cited material does not support that "[l]ike other employees, Ms. Baker understood the procedures to clock in and out each day," and should be

stricken. Baker testified that she was "taught what program to use on the laptop." [Defendants' Ex. J, Baker Dep., p. 46:3-13.]

74. Like other employees, Ms. Harris was instructed on the proper clock in and clock out procedures. Def. SAMF, Ex. K, Dep. Harris, p. 49:3-6.

**Plaintiffs' Response:** Admit that Harris and other employees were instructed on clock in and clock out procedures, except deny that the cited material supports that Harris described them as "proper" procedures and should be stricken. [Defendants' Ex. K, Harris Dep., p. 49:3-15.]

75. Like other employees, Ms. Canas states that the procedures did not change with respect to clock in and out procedures. Def. SAMF, Ex. L, Dep. Canas, p. 39:13-21.

**Plaintiffs' Response:** Deny. The cited material does not support that, "[l]ike other employees, Ms. Canas states that the procedures did not change with respect to clock in and out procedures," and should be stricken. Canas testified "I don't remember" in response to the question of whether she had to log into the system or clock in and that the "process" for "using your keycard to gain access to the floor" did not change during her employment. [Defendants' Ex. L, Canas Dep., p. 39:13-21.]

**Supervision of Class and Collective Members**

76. During her employment, Ms. Bayne reported to multiple NAPW supervisors. Def. SAMF, Ex. F, Dep. Bayne, pp. 46:21-48:14.

**Plaintiffs' Response:** Admit.

77. Ms. Bayne did not set her own hours and does not recall her hours changing. Def. SAMF, Ex. F, Dep. Bayne, p. 49:21-25.

**Plaintiffs' Response:** Neither admit nor deny. The cited material does not support the statement made and should be stricken.

78. During her employment, Ms. Farris reported to NAPW General Manager, Kristy DeMonte. Def. SAMF, Ex. H, Dep. Farris, p. 73:3-6.

**Plaintiffs' Response:** Admit.

79. Ms. Farris recalls the hours being from 9:00 a.m. to 5:00 p.m., Monday through Friday. Def. SAMF, Ex. H, Dep. Farris, 49:10-12.

**Plaintiffs' Response:** Admit, subject to clarification that Farris testified the "hours of operation at NAPW" were 9:00 to 5:00 p.m., Monday through Friday, and that she worked past 5:00 p.m. [Defendants' Ex. H, Farris Dep. 54:8-14; 74:5-20].

80. Ms. Bourassa reported directly to a NAPW supervisor. If problems arose, she could always reach out to the NAPW HR Director. Def. SAMF, Ex. I, Dep. Bourassa, p. 22:5-18.

**Plaintiffs' Response:** Deny. The cited material does not support that she "reported directly to a NAPW supervisor," and should be stricken. Bourassa testified that she reported to director of sales Katie Maloney, Vice President Ben Costanza, and HR Director Julia Saidnia. [Defendants' Ex. I, Bourassa Dep., p. 22:5-18].

81. During her period of employment, Ms. Baker reported directly to a NAPW supervisor. Def. SAMF, Ex. J, Dep. Baker, pp. 40:19-41:13.

**Plaintiffs' Response:** Deny. The cited material does not support that Baker "reported directly to a NAPW supervisor," and should be stricken. [Defendants' Ex. J, Baker Dep., pp. 40:19-41:13**: Q.** Okay. You mentioned a supervisor. Who was the person you identified as your supervisor? **A.** I don't remember. **Q.** Can you describe the person for me? **A.** Dark hair. **Q.** Tall, short? **A.** I don't know, we were all sitting. **Q.** Fair enough. General build? **A.** I'm not sure. **Q.** Okay. Glasses, no glasses? **A.** I don't remember. **Q.** Dark hair? **A.** It's been a while. **Q.** Dark hair?

**A.** Dark hair. **Q.** Okay. Anyone other than that person you identified as your supervisor, did you ever report to? **A.** ·No, she was my main person."]

82. Ms. Baker did not control her own work schedule, and was assigned hours to work on a daily basis. Def. SAMF, Ex. J, Dep. Baker, p. 38:4-13.

**<u>Plaintiffs' Response</u>:** Deny. The cited material does not support that "Baker did not control her own work schedule, and was assigned hours to work on a daily basis," and should be stricken. [Defendants' Ex. J, Baker Dep., p. 38:1-18: **"A.** Honestly, I'm not sure. I don't know. We were there to motivate each other for sales. **Q.** Those who worked from home? **A.** Yes. **Q.** Okay. And so, would you have any meetings? **A.** We would have meetings and we would work together on the training for rebuttals. **Q.** Okay. **A.** On how to close the sale. **Q.** And did that occur on a daily basis? **A.** Maybe for at least a week, that I can remember. **Q.** Okay.· So, are you speaking, when you speak -- excuse me.· When you speak of the webcam and seeing others on the webcam, are you specifically thinking through the time when you were training? **A.** No, during sales as well."]

83. During her employment, Ms. Harris reported directly to a NAPW supervisor. Def. SAMF, Ex. K, Dep. Harris, p. 31:6-8.

**<u>Plaintiffs' Response</u>:** Deny. The cited material does not support that Harris "reported directly to a NAPW supervisor," and should be stricken. Harris only testified that the name of her supervisor was Maria Nania. [Defendants' Ex. K, Harris Dep., p. 31:6-8].

84. During her employment, Ms. Canas reported directly to a NAPW supervisor. Def. SAMF, Ex. L, Dep. Canas, p. 32:13-15.

**<u>Plaintiffs' Response</u>:** Deny. The cited material does not support that "Ms. Canas reported directly to a NAPW supervisor," and should be stricken. [Defendants' Ex. L, Canas Dep., p. 32:13-

15: **"Q.** Who was your immediate supervisor? So, who did you report to? **A.** To be honest, I believe it was Debora [Bayne]."]

### Schedule of Class and Collective Members

85. During her employment, Ms. Canas was assigned a schedule of 8:00 a.m. to 5:00 p.m. Def. SAMF, Ex. L, Dep. Canas, p. 32:3-9.

**Plaintiffs' Response:** Admit.

86. Ms. Bayne's payroll records reflect NAPW as her employer of record. See Defendants Exhibits M and N.

**Plaintiffs' Response:** Admit that Bayne's payroll records reflect "N A P W MERGER SUB INC.," (Defendants' Exhibit M) but deny to the extent that Defendants are claiming that Plaintiff Bayne was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.] Plaintiff Bayne also testified that PDN was her employer. [Ex. F, Deposition of Deborah Bayne, p. 91:2-20.]

87. Ms. Farris's paychecks were issued by NAPW. Ex. H, Dep. Farris, pp. 38:18-39:1.

**Plaintiffs' Response:** Admit, subject to the clarification that Farris testified that "before 2012" the name NAPW appeared on her paychecks (Defendants' Ex. H, Farris Dep., p. 38:5-8) and that "[i]t changed in [20]'14 when PDN . . . bought NAPW," at which point "checks were coming from Chicago . . . I can't recall the name on the checks" and her W-2s listed "NAPW with a Chicago address." [*Id*. p. 38:9-17.]

88. Ms. Bourassa's W-2 identifies NAPW as her employer of record. Ex. I, Dep. Bourassa; Bourassa W-2, Exhibit 1 to Deposition of Bourassa, attached as Defendants Exhibit O.

**Plaintiffs' Response:** Admit that Bourassa's W-2 identifies "NAPW INC.," as her employer, subject to the clarification that the address listed is PDN's 801 W Adams St., Ste 600, Chicago, IL 60607 location. [Defendants' Ex. O.] Further, Amy Bourassa testified that NAPW was listed as her employer on her tax return "until they were taken over by PDN…" [Ex. I, Deposition of Amy Bourassa p. 42:1-5.]

### W-2's for Class and Collective Members

89. Ms. Baker's W-2 identifies NAPW as her employer of record. Ex. J, Dep. Baker, pp. 58:14-59:8.

**Plaintiffs' Response:** Neither admit nor deny. The cited material does not support the statement made and should be stricken. [Defendants' Ex. J, Baker Dep. pp. 58:14-59:8: **Q.** Okay. And did you file any tax returns for the taxable year of 2016? **A.** I did. **Q.** And did you receive any tax forms, like a W-2? **A.·** I think so. **Q.** Did you receive one from NAPW? **A.** I believe so. *Q. And was NAPW's name reflected on that W-2? A. It may have been. I don't remember.* **Q.·** Okay.· Who did you list as your employer on your tax documents for the taxable year 2016? **A.** NAPW. **Q.** Okay.· Do you remember ever seeing the name PDN listed anywhere on your pay stubs? **A.** I don't remember**. Q.** Okay.· Did you list PDN as your employer on your tax documents for 2016? **A.** I don't think so."] (emphasis added).

90. Ms. Harris's W-2 identifies NAPW as her employer of record. Ex. K, Dep. Harris, Harris Tax Form, Exhibits 1 to Deposition, attached as Defendants Exhibit P; Harris Tax Form, Exhibit 2 to Deposition, attached as Defendants Exhibit Q.

**Plaintiffs' Response:** Admit that Harris's W-2 identifies "NAPW INC.," as her employer subject to the clarification that the address listed is PDN's 801 W Adams St., Ste 600, Chicago, IL 60607 location. [Defendants' Ex. Q.]

91. Ms. Canas's paystub reflect NAPW as her employer of record. Ex. L, Dep. Canas, pp. 49:23-50:15; Canas Paystub, Exhibit 2 to Deposition, attached as Defendants Exhibit R.

**Plaintiffs' Response:** Admit, but deny to the extent that Defendants are claiming that Canas was exclusively employed by NAPW and not by Defendant PDN. [*See e.g.* Plaintiffs' Statement of Material Facts submitted in support of Plaintiffs' Motion for Partial Summary Judgment, ¶¶ 7-75.]

92. Ms. Canas's W-2 identifies NAPW as her employer or record. Ex. L, Dep. Canas, pp. 8:4-22, 48:8-10, Canas W-2, Exhibit 1 to Deposition, attached as Defendants Exhibit S.

**Plaintiffs' Response:** Admit that Canas's W-2 identifies "NAPW INC.," as her employer subject to the clarification that the address listed is PDN's 801 W Adams St., Ste 600, Chicago, IL 60607 location. [Defendants' Ex. S.]

93. Although Plaintiff has indicated that there was a shared accounting service, record evidence also establishes that NAPW had its own accountant employee to support the company's business. Pl. SMF, Ex. A, Dep. Bzdyl, p. 109:9-10.

**Plaintiffs' Response:** Admit that NAPW employed an accountant but deny to the extent that Defendants are claiming that they did not share accounting services. [Ex. J, Bdzyl Dep., p. 56:12-23 ("In the past, [information about hiring] would be sent to accounting as accounting was often a shared service between the companies.")].

Dated: New York, New York
      October 21, 2022

                           VIRGINIA & AMBINDER, LLP

                    By: _____/s/_____
                        Jack L. Newhouse, Esq.
                        Michele A. Moreno, Esq.
                        40 Broad Street, 7th Floor
                        New York, New York 10004

Tel: (212) 943-9080
Fax: (212) 943-9082
jnewhouse@vandallp.com

*Counsel for Plaintiffs*