UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

DEBORA BAYNE, *and all other persons similarly*      :
*situated*,                                                          :
                                                                    :
                                    Plaintiffs,         :        REPORT AND
                                                        :        RECOMMENDATION
            -against-                                    :
                                                        :        18-CV-3591 (MKB)(MMH)
NAPW, INC. d/b/a NATIONAL ASSOCIATION OF   :
PROFESSIONAL WOMEN d/b/a INTERNATIONAL:
ASSOCIATION OF WOMEN and PROFESSIONAL   :
DIVERSITY NETWORK, INC. d/b/a NATIONAL      :
ASSOCIATION OF PROFESSIONAL WOMEN          :
d/b/a INTERNATIONAL ASSOCIATION OF           :
WOMEN,                                                      :
                                                        :
                                    Defendants.        x

----------------------------------------------------------------

**MARCIA M. HENRY**, United States Magistrate Judge:

In June 2018, Plaintiff Debora Bayne commenced this action against Defendants

NAPW, Inc. d/b/a National Association of Professional Women d/b/a International

Association of Women ("NAPW") and Professional Diversity Network, Inc. d/b/a National

Association of Professional Women d/b/a International Association of Woman ("PDN"),

alleging violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* (the "FLSA") and

New York Labor Law, Art. 6, §§ 1 *et seq.* (the "NYLL"). (*See generally* Compl., ECF No.

1.)[1] The Court later granted certification of an FLSA collective action pursuant to 29 U.S.C.

§ 216(b) and a class action under Federal Rule of Civil Procedure 23(b)(3). (ECF Nos. 26,

93.)

---

[1] All citations to documents filed on ECF are to the ECF document number (*i.e.*, "ECF No. ___")
and pagination "___ of ___" in the ECF header unless otherwise noted.

Before the Court are (1) Plaintiffs' motion for partial summary judgment (Pls.' Mot., ECF No. 113)[2] and (2) PDN's motion for summary judgment (PDN Mot., ECF No. 116).[3] The Honorable Margo K. Brodie referred the motions for report and recommendation. (Nov. 3, 2022 Order.) For the reasons stated below, the Court respectfully recommends that PDN's motion should be **denied** and that Plaintiffs' motion should be **granted in part and denied in part**.

## I. BACKGROUND

### A. Undisputed or Unopposed Material Facts[4]

#### 1. The Parties

Plaintiffs are sales representatives located in states including New York, California, and Illinois, that use telephones and computers to sell memberships to NAPW and the

---

[2] Plaintiffs include a notice of motion (Pls.' Mot., ECF No. 113), memorandum of law (Pls.' Mem., ECF No. 113-1), Local Civil Rule 56.1 statement of facts (Pls.' 56.1 Stmt., ECF No. 113-2), declaration of Jack L. Newhouse (Newhouse Decl., ECF No. 113-3) and its 38 exhibits (ECF Nos. 113-4 through 113-41), and a certificate of service (ECF No. 113-42). Defendants' opposition includes a memorandum of law (Defs.' Opp., ECF No. 114), responsive Rule 56.1 statement of facts and statement of additional material facts (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 1–44 and Defs.' Add. 56.1 Stmt., ECF No. 114-1 at 44–57, respectively), and declaration of Yu-Jin Chou (Chou Decl., ECF No. 114-2), and 19 supporting exhibits (ECF No. 114-3 through 114-21). Plaintiffs also submitted a reply brief (Pls.' Reply, ECF No. 115), Local Civil Rule 56.1 counterstatement of facts (Pls.' Reply 56.1 Stmt., ECF No. 115-1), reply declaration of Jack L. Newhouse (Newhouse Reply Decl., ECF No. 115-2), its sole exhibit (ECF No. 115-3), and certificate of service (ECF No. 115-4).

[3] PDN includes a notice of motion (PDN Mot., ECF No. 116), memorandum of law (PDN Mem., ECF No. 116-1), Local Civil Rule 56.1 statement of facts (PDN 56.1 Stmt., ECF No. 116-2), and 20 supporting exhibits (ECF Nos. 116-3 through 116-21, and 119). Plaintiffs' opposition includes a memorandum of law (Pls.' Opp., ECF No. 117), responsive Local Civil Rule 56.1 statement of facts (Pls.' Opp. 56.1 Stmt., ECF No. 117-1), opposing declaration of Jack L. Newhouse (Newhouse Opp. Decl., ECF No. 117-2), its 20 exhibits (ECF Nos. 117-3 through 117-22), and certificate of service (ECF No. 117-23). PDN also submitted a reply brief (PDN Reply, ECF No. 118) and certificate of service (ECF No. 118-1).

[4] The Court has considered the facts set forth herein from the parties' declarations and exhibits attached thereto, and the Rule 56.1 Statements of Facts and opposing 56.1 Statements. The Court

International Association of Women,[5] a networking group, to individuals all over the country. (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 2 ¶ 4.)  NAPW and PDN are Delaware corporations. (*Id.* at 1–2 ¶¶ 2–3.)  At all relevant times, Plaintiffs were employed by and under the control of NAPW.  (*Id.* at 5 ¶ 11.)

PDN's principal place of business is located at 801 West Adams Street, Suite 600, Chicago, Illinois 60607.  (Pls.' 56.1 Stmt., ECF No. 113-2 ¶ 3; PDN 56.1 Stmt., ECF No. 116-2 ¶ 3.)[6]  NAPW's principal place of business was in Garden City, New York, until mid-2018, when NAPW vacated that office and moved to PDN's offices in Chicago, at which time NAPW's employee files were boxed and shipped to that office.  (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 27 ¶¶ 74–75.)

## 2.    Consent Judgment

In February 2012, the U.S. Department of Labor, NAPW, and NAPW's founder, president, and then-Chief Executive Officer ("CEO") Matthew Proman executed a Consent Judgment, which this Court approved.  (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 3 ¶ 6 (citing

---

must and will construe the facts in the light most favorable to the nonmoving party.  *See Capobianco v. City of New York*, 422 F.3d 47, 50 n.1 (2d Cir. 2005).  Unless otherwise noted, the parties consider the following facts undisputed, or the opposing party has not proffered evidence in the record to dispute them.

[5] In February 2018, the networking organization known as "National Association of Professional Women" was rebranded and named "the International Association of Women."  (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 5–6 ¶ 13.)

[6] Defendants' Responsive 56.1 Statement acknowledges that PDN "formerly" maintained an office at the 801 West Adams Street address but notes that PDN's new corporate office is located at a different Chicago address.  (*See* Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 2 ¶ 3.)  To support this assertion, Defendants provide an incomplete citation with reference to an exhibit that does not exist in the record.  Specifically, there is no "Exhibit T" submitted in support of Defendants' memorandum at ECF No. 114.  Therefore, the Court considers PDN's address at 801 West Adams Street address to be undisputed.

ECF No. 113-37 (U.S. Dep't of Labor Consent Judgment)); Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 43 ¶ 125.) The Consent Judgment permanently enjoined NAPW and Proman from violating the FLSA and 29 C.F.R. Part 516 and ordered them to pay their employees overtime wages. (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 3 ¶ 6.) The Consent Judgment further ordered NAPW and Proman to preserve adequate records of their employees and their hours worked. (*Id.* at 43 ¶ 125.)

### 3. NAPW Corporate Structure and Operations

In June 2012, the entity known as NAPW, Inc. ("old NAPW") was responsible for employing sales representatives and operating the networking group. (*Id.* at 6 ¶ 14.) In September 2014, old NAPW merged with NAPW, and NAPW became a wholly owned subsidiary of PDN. (*Id.* at 6 ¶¶ 15–16.) At that time, old NAPW's registration status with the New York State Department of State became inactive and ceased to exist, and NAPW accepted the obligations of old NAPW. (*Id.* at 6 ¶¶ 17, 19.)

Following the merger, some executives from NAPW joined PDN and executed duties involving PDN and/or NAPW. NAPW CEO Proman became Executive Vice President, Chief Operating Officer, and Director for PDN. (*Id.* at 7 ¶ 20.) The parties disagree on Proman's involvement in the "operational decision-making" at PDN, but appear to agree that Proman's "'hands-on' entrepreneurial approach at the Company's NAPW subsidiary include[d] his day-to-day operational leadership of NAPW's sales, technology and marketing functions." (Pls.' Reply 56.1 Stmt., ECF No. 115-1 ¶ 5 (citing ECF No. 113-15 at 30 (PDN 2014 Form 10-K).)

There were other cross-over executives between PDN and NAPW. David Mecklenburger was the Chief Financial Officer for PDN from July 2013 through at least March 30, 2016. (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 16 ¶ 42.) During that time, he signed at

least one paycheck issued by NAPW to NAPW's sales representatives. (*Id.* at 16 ¶ 43 (citing ECF No. 113-11 at 5 (Hoffman Decl., Ex. 1)).) Katherine Butkevich, who was the pre-merger Chief Financial Officer of NAPW from 2012 to 2014, was the post-merger CEO of PDN from March 2016 to December 2016. (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 19 ¶¶ 55–56.) In December 2016, Jim Kirsch, PDN's former CEO and PDN's then-current Executive Co-Chair and Director of the Board of Directors, hired Butkevich as the CEO of NAPW. (*Id.* at 19 ¶ 54.) In January 2017, Joseph Bzdyl became the Executive Vice President of PDN. (*Id.* at 16 ¶ 45.) Bzdyl served as the Rule 30(b)(6) corporate representative for the depositions of both NAPW and PDN in this case. (*Id.* at 16 ¶ 46.)

### 4. Plaintiffs' Work Hours and Payment

Plaintiff Bayne and six additional NAPW sales representatives who worked for NAPW in New York from 2009 through 2019 testified to receiving a salary for 40 hours per week plus commissions and bonuses during their entire employment. (*Id.* at 30 ¶ 82.) However, the parties disagree on whether Plaintiffs were paid overtime compensation when they worked over 40 hours in a week. (*Id.* at 30 ¶ 83.) No party has produced payroll records that reflect the payment of overtime compensation to Plaintiffs during the relevant statutory period, except for one week in 2013. (*Id.* at 30–31 ¶¶ 84–85.) Defendants admit that they in fact do not possess any payroll records for the period from 2012 to 2015. (*Id.* at 29–30 ¶ 81) ("[A]s the company transitioned from one system to another, those records were not retained.") For the paystubs that were produced, Plaintiffs' paystubs were blank or reflected $12.50 per hour as

their regular pay rate.  (*Id.* at 42 ¶ 122.)  The pay period for Plaintiffs was Saturday to Friday.  (*Id.* at 35 ¶ 98.)

### B.    Procedural History

On June 20, 2018, Plaintiff Bayne initiated this action.  (Compl., ECF No. 1.)  In November 2018, the Court granted certification of an FLSA collective action consisting of "[a]ll current and former employees of NAPW, Inc. and Professional Diversity Network, Inc. who worked as sales representatives selling memberships to the National Association of Professional Women or International Association of Women from [THREE YEARS PRIOR TO THE ORDER] through the present."  (FLSA Certification Order, ECF No. 26 at 8.)  In October 2021, the Court certified a Rule 23(b)(3) class consisting of all "individuals employed in New York from June 20, 2012 to the present by NAPW, Inc. and Professional Diversity Network, Inc. to sell memberships to the women's networking organization known as National Association of Professional Women and the International Association of Women," not including "corporate officers, shareholders, directors and administrative employees."  (Rule 23 Certification Order, ECF No. 93 at 3 (cleaned up)).  The Court ordered Defendants to produce to Plaintiffs a list of all class members, with names and contact information.  (*Id.*)  Following this order, opt-in Plaintiffs joined the action.  (Consent Forms, ECF Nos. 99, 101–02.)  The parties agreed to move for summary judgment before proceeding further with discovery.  (Order, ECF No. 100.)

In October 2022, Plaintiffs and PDN filed cross-motions for summary judgment.  (Pls.' Mot., ECF No. 113; PDN Mot., ECF No. 116.)  Judge Brodie referred the motions for report and recommendation.  (Nov. 3, 2022 Order.)

## II.  **LEGAL STANDARD**

### A.  **Summary Judgment**

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists where the evidence is such that a reasonable jury could decide in the non-movant's favor." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (cleaned up).  "The burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment, and in assessing the record to determine whether there is a genuine issue as to a material fact, the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (cleaned up).  "If the moving party carries its burden, the nonmoving party must come forward with evidence that would be sufficient to support a jury verdict in its favor." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (cleaned up).

"A party asserting that a fact cannot be or is genuinely disputed must . . . cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c); *see also McKinney*, 49 F.4th at 738 ("Thus, rather than merely deny the moving party's allegations in a general way, the party opposing summary judgment must present competent evidence that creates a genuine issue of material fact.") (cleaned up).

For cross-motions for summary judgment, "the court evaluates each party's motion on its own merits, and all reasonable inferences are drawn against the party whose motion is under

consideration." *Roberts v. Genting New York LLC*, 68 F.4th 81, 88 (2d Cir. 2023) (cleaned up). "[I]n reviewing the evidence and considering what inferences may reasonably be drawn, the court 'may not make credibility determinations or weigh the evidence.'" *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021) (citing *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)).

## III. **DISCUSSION**

Plaintiffs move for partial summary judgment as to liability against NAPW and PDN for willful failure to pay overtime compensation and failure to provide accurate wage statements. (Pls.' Mot., ECF No. 113-1 at 10–32.) Defendants cross-move for summary judgment on two grounds: under federal or state law (1) PDN did not employ Plaintiffs and (2) PDN and NAPW are not a joint employer. (PDN Mem., ECF No. 116-1 at 5–8.)

As set forth below, Plaintiffs are not entitled to summary judgment against PDN because there are genuine issues of material fact regarding whether PDN is their employer under the FLSA or the NYLL. However, the record establishes that NAPW willfully failed to pay overtime wages under the FLSA and NYLL and failed to provide accurate wage statements under the NYLL, which entitles Plaintiffs to damages.

### A. **PDN's Status as Plaintiffs' Employer Under the FLSA**[7]

In their motion, Plaintiffs argue that PDN *and* NAPW employed them, and therefore PDN is jointly and severally liable with NAPW for all damages, for two reasons. (Pls.' Mem.,

---

[7] To establish a minimum wage or overtime claim under the FLSA, the "plaintiff must prove the following: (1) the defendant is an employer subject to [the] FLSA; (2) the plaintiff is an 'employee' within the meaning of [the] FLSA; and (3) the employment relationship is not exempted from [the] FLSA." *Payamps v. M & M Convenience Deli & Grocery Corp.*, No. 16-CV-4895 (LDH)(SJB), 2019 WL 8381264, at *6 (E.D.N.Y. Dec. 9, 2019) (cleaned up); 29 U.S.C. §§ 206(a), 207(a).

ECF No. 113-1 at 13–14.)  First, Plaintiffs assert that Defendants are a "single integrated employer" subject to joint liability because they maintain interrelated operations, common management, centralized control of labor relations, and common ownership.  (*Id.* at 14–21.) Second, Plaintiffs argue that the record establishes PDN as their employer under the "joint employer doctrine" because PDN and NAPW exercised both formal and functional control over them.  (*Id.* at 21 n.2.)

In support of their motion and in opposition to Plaintiffs' motion, Defendants respond that Plaintiffs failed to establish joint employer liability and that PDN and NAPW are not a single integrated enterprise or joint employer for purposes of liability.  (Defs.' Opp., ECF No. 114 at 5–14; PDN Mem., ECF No. 116-1 at 5–8.)

The FLSA applies only to a qualifying "employer."  29 U.S.C. §§ 206(a), 207(a); *see also id.* § 216(b) ("Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.").  An employer includes "any person [*e.g.,* an individual or a corporation] acting directly or indirectly in the interest of an employer in

---

Here, the parties do not dispute that NAPW was Plaintiffs' employer, and that Plaintiffs were NAPW's employees, subject to the FLSA.  (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 5 ¶ 11.)

Further, the parties do not dispute that Plaintiffs were "non-exempt" employees who qualified for overtime pay within the FLSA. *See* 29 U.S.C. § 213(a)(1) (listing multiple exemptions). Defendants admit that Plaintiffs were "sales representatives" who were "to receive overtime compensation when working more than forty (40) hours in a week."  (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 28–29 ¶ 78.)  "Overtime was supposed to be calculated by taking a sales representative's 'base salary plus their commission earned, divided by 40, multiplied by 1.5, multiplying by any hours over 40.'"  (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 29 ¶ 79 (citing ECF No. 113-41 (NAPW Wage Rate Notice)).)  Accordingly, the only issue in dispute as to coverage under the FLSA is PDN's status as Plaintiffs' employer.

relation to an employee." *Id.* §§ 203(a), 203(d), 207(a)(1). "'[T]he determination of whether an employer-employee relationship exists for purposes of the FLSA should be grounded in 'economic reality rather than technical concepts,' determined by reference not to 'isolated factors, but rather upon the circumstances of the whole activity[.]'" *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (quoting *Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961) and *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947)). District courts in this circuit typically analyze whether separate defendants may be jointly liable for FLSA violations using two separate tests: the single integrated enterprise test (or single employer test) and the joint employer test. *See Jaramillo v. Latino Regal Corp.*, No. 19-CV-3104 (HG)(CLP), 2023 WL 8828823, at *4 (E.D.N.Y. Dec. 21, 2023).

Under either test, for reasons stated below, the Court finds that disputed issues of material fact exist regarding PDN's status as Plaintiffs' employer. Accordingly, summary judgment is precluded as to PDN's liability under the FLSA, "as there must be an employer-employee relationship to establish liability." *Chang v. Loui Amsterdam, Inc.*, No. 19-CV-3056 (RER), 2022 WL 4586100, at *5 (E.D.N.Y. Sept. 29, 2022).

### 1. Single integrated enterprise test

"A single employer situation exists where two nominally separate entities are actually part of a single integrated enterprise." *Arculeo v. On-Site Sales & Mktg., LLC*, 425 F.3d 193, 198 (2d Cir. 2005) (cleaned up). "In such circumstances, of which examples may be parent and wholly-owned subsidiary corporations, or separate corporations under common ownership and management, the nominally distinct entities can be deemed to constitute a single enterprise." *Id.* (citing *Cook v. Arrowsmith Shelburne, Inc.*, 69 F.3d 1235, 1240–41 (2d Cir. 1995)). "The Second Circuit has never endorsed this theory of liability in the FLSA context,

and district courts in this Circuit are divided on its application to FLSA and NYLL cases." *Dobrosmylov v. DeSales Media Grp., Inc.*, 532 F. Supp. 3d 54, 62 (E.D.N.Y. 2021); *Wang v. Leo Chituya Ltd.*, No. 20-CV-10395 (JLR), 2024 WL 324789, at *4 n.3 (S.D.N.Y. Jan. 29, 2024) (collecting cases). Where courts have applied this theory of liability, they "have relied on four considerations: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership or financial control." *Griffin v. Sirva Inc.*, 835 F.3d 283, 292 (2d Cir. 2017). No one factor is determinative, but "control of labor relations is the central concern." *Id.* (quoting *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996)).

Here, drawing all inferences in Defendants' favor as the non-movants, a reasonable jury could conclude that PDN and NAPW are not a single integrated enterprise, thereby precluding summary judgment for Plaintiffs regarding PDN's status as their employer.

### a. Interrelation of Operations

To determine interrelated operations, courts consider, among other factors, "the level of joint involvement in daily decisions relating to production, distribution, marketing, and advertising," *Dias v. Cmty. Action Project, Inc.*, No. 07-CV-5163 (NGG)(RER), 2010 WL 11626874, at *6 (E.D.N.Y. Aug. 23, 2010), whether the entities "share employees, services, records, and equipment" and "commingled bank accounts, accounts receivable, inventories, and lines of credit," *Dobrosmylov*, 532 F. Supp. 3d at 62 (cleaned up), and whether "one entity prepared and filed the other's tax returns," *Dias*, 2010 WL 11626874, at *6.

Plaintiffs argue that PDN and NAPW have interrelated operations because PDN "combined its resources with NAPW to create a new NAPW website," "made numerous changes to the sales and marketing structure within [NAPW]," "'upgraded' NAPW's sales

tracking and timekeeping system," and "shared accounting," and because NAPW used a service called Webair paid for "using PDN's credit card." (Pls.' Mem., ECF No. 113-1 at 15–16.) Plaintiffs also highlight the promotion of some NAPW senior executives to the PDN board following the September 2014 merger to show interrelatedness of operations, as well as PDN's post-merger welcome letter that refers to NAPW sales representatives as "employees of [PDN]," to make the case that NAPW and PDN were an integrated entity. (ECF No. 113-9 at 16 (Mortillaro Decl.).)

However, Defendants point to evidence from which a reasonable inference may be drawn that PDN and NAPW do not have interrelated operations. For example, Bzdyl, Defendants' corporate representative, testified that despite some cross-over of board membership between PDN and NAPW, NAPW still operated under its own Chief Executive Officer, Human Resources Director, Vice President of Operations, Network Administrator, Director of Sales, Director of Local Chapters, Sales Management and Leadership, and Hiring Managers. (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 10 ¶ 28 (citing ECF No. 113-13 at 42–56 (Bzdyl Dep.)).) As to shared services between the two entities, Bzdyl's testimony suggests that PDN and NAPW did not maintain one integrated customer relationship management system to manage sales and track time worked by Plaintiffs. (ECF No. 113-13 at 181:3–9 (Bzdyl Dep.).) According to Bzdyl, PDN and NAPW maintained separate accounts when using the same third-party vendor, Paylocity, to handle tax forms. (*Id.* at 148:19–21.)

With respect to the commingling of accounts, Defendants also rely on PDN's 2014, 2015, 2017 and 2019 Form 10-K to show that all business accounts and financials were kept separate between PDN and NAPW. (Defs.' Add. 56.1 Stmt., ECF No. 114-1 at 47 ¶ 21 (citing ECF No. 113-15 (PDN 2014 Form 10-K); ECF No. 113-16 (PDN 2015 Form 10-K (Relevant

Portions)); ECF No. 113-19 (PDN 2017 Form 10-K); ECF No. 113-39 (PDN 2019 Form 10-K)).) On the other hand, Bzdyl admitted that "accounting was often a *shared* service between the companies," at least in 2018. (ECF No. 113-13 at 56:18–23 (Bzdyl Dep.) (emphasis added).) It is unclear from this testimony alone the extent of the "commingling" that occurred between the two entities' bank accounts, accounts receivable, inventories, and credit lines. Construing these competing facts in Defendants' favor, a reasonable jury could find that the first factor of interrelated operations weighs in favor of Defendants.

**b.     Centralized Control of Labor Relations**

Second, the record supports a reasonable inference that PDN and NAPW did not share centralized control of labor relations, a factor that is "the central concern" in the single integrated enterprise analysis. *Moscatelli v. Owl's Nest, Inc.*, 554 F. Supp. 3d 437, 442 (E.D.N.Y. 2021) (citing *Murray*, 74 F.3d at 404). Evidence of centralized control of labor relations includes "handling job applications, approving personnel status reports, [or] exercising veto power over major employment decisions." *Shiflett v. Scores Holding Co.*, 601 F. App'x 28, 31 (2d Cir. 2015).

Plaintiffs argue that PDN "controlled" NAPW's staffing levels and employment of key personnel and "instituted policies, practices, and procedures" whereby PDN was "directly engaged" with NAPW workers regarding day-to-day conditions of employment. (Pls.' Mem., ECF No. 113-1 at 17.) For example, in its 2015 10-K Form, PDN writes, "[a]s part of our efforts at the NAPW Network, [PDN] took a number of steps aimed at reducing costs and improving efficiency," including "reduc[ing] the number of sales professionals from 105 to 57" and "maintain[ing] an altered commission schedule developed during Q3 of 2015 . . . to

properly incentivize sales professionals and drive maximum productivity." (ECF No. 113-16 at 3 (PDN 2015 Form 10-K).)

However, the record also shows that PDN may not have exercised the level of control Plaintiffs claim over NAPW's hiring, firing, payroll, and managerial decisions with respect to NAPW employees. For example, Bzdyl testified that NAPW had its own hiring and sales managers that were responsible for all hiring decisions and they conducted their own hires and terminations, while PDN was "solely involved in tracking employee head count." (Pls.' Reply 56.1 Stmt., ECF No. 115-1 ¶ 40 (citing ECF No. 113-13 at 26:18–27:17, 54–56 (Bzdyl Dep.)).) Plaintiff Bayne's testimony showed that, during her employment at NAPW, she reported to multiple NAPW supervisors, but it is unclear whether she reported to any PDN supervisors as well. (Pls.' Reply 56.1 Stmt., ECF No. 115-1 ¶ 76 (citing ECF No. 114-8 at 46:21–48:14 (Bayne Dep.)).) Moreover, the NAPW Employee Handbook reflects that NAPW enforced its own policies within its workplace pertaining to standards of conduct, sexual harassment, pay periods, benefits, paid time off, and other personnel-related topics. (ECF No. 114-3 at 2 (NAPW Employee Handbook).)

While PDN may have some influence and oversight as the corporate parent, the extent of its centralized control with NAPW over day-to-day employment decisions of NAPW workers is a disputed issue that makes summary judgment inappropriate.

### c. Common Management

Third, as to common management, "the mere existence of common management and ownership are not sufficient to justify treating a parent corporation and its subsidiary as a single employer." *Morangelli v. Chemed Corp.*, 922 F. Supp. 2d 278, 286 (E.D.N.Y. 2013). Therefore, the undisputed fact that NAPW is a wholly owned subsidiary of PDN is not

dispositive in the single employer analysis. Plaintiffs point out the number of executives who held positions at NAPW while also maintaining board seats with PDN. (Pls.' Mem., ECF No. 113-1 at 20.) Plaintiffs also argue that PDN was "highly dependent on . . . key employees," including Proman. (Pls.' Reply 56.1 Stmt., ECF No. 115-1 ¶ 5 (citing to ECF No. 113-15 at 22 (PDN 2014 Form 10-K)).) Defendants, on the other hand, argue that the board members of PDN either had little to no involvement in NAPW or held primary duties exclusively for NAPW, and that the board members' involvement with either of the entities ended by 2017. (Defs.' Opp., ECF No. 114 at 11–12.) For example, Bzdyl testified that Proman "was never involved in operational decision-making with PDN" while he was on the board, and that his primary responsibilities only related to his role as CEO of NAPW. (ECF No. 113-13 at 135–36 (Bzdyl Dep.).) Defendants point out that Proman's status as a PDN board member was limited because his tenure with NAPW only lasted for one year after the merger, ending in July 2015. (Defs.' Opp., ECF No. 114 at 11.) For these reasons, the record is not conclusive as to the issue of common management between PDN and NAPW.

### d.     Common Ownership and Financial Control

Finally, regarding common ownership and financial control, Plaintiffs rely solely on the undisputed fact that NAPW is a wholly owned subsidiary of PDN. (Pls.' Mem., ECF No. 113-1 at 21.) However, as stated above, this fact alone is not sufficient to justify treating a parent corporation and its subsidiary as a single employer. *Morangelli*, 922 F. Supp. 2d at 286. The only other fact that Plaintiffs proffer to support a finding of common ownership and financial control is PDN's 2014 Form 10-K to show that Proman "owned 40.1% of PDN's common stock." (ECF No. 113-15 at 24 (PDN 2014 Form 10-K).) Defendants respond that this is misleading, as Proman entered into a separation agreement with PDN in July 2015, and

Proman did not own any stock in the company as of 2019. (ECF No. 113-39 at 58 (PDN 2019 Form 10-K).) Moreover, the fact that Proman owned PDN shares while he was CEO of NAPW does not necessarily mean that PDN exercised financial control over NAPW. A reasonable juror could find that NAPW and PDN did not share common ownership, despite Proman's status as CEO or shareholder.

Considering that the Court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought and may not determine credibility or weigh evidence, there is a genuine dispute of material fact as to whether Defendants constitute a single integrated enterprise sufficient to establish PDN as Plaintiffs' employer. *Frost*, 980 F.3d at 242; *Yadid*, 999 F.3d at 877. Accordingly, the Court respectfully recommends denying Plaintiffs' motion for partial summary judgment regarding PDN's status as Plaintiffs' employer under the single integrated enterprise theory.

### 2.      Joint employer test

"A conclusion that employers are 'joint' assumes that they are separate legal entities, but that they . . . handle certain aspects of their employer-employee relationship jointly." *Arculeo*, 425 F.3d at 198 (cleaned up). For example, "[a]n employee formally employed by one entity can be found to be constructively employed by another entity, and thus may impose liability for violations of employment law on the constructive employer." *Griffin*, 835 F.3d at 292–93 (citation omitted). In assessing the "economic reality" of a particular employment situation, courts apply different sets of relevant factors based on the factual challenges posed by particular cases—specifically, some related to formal control and others to functional control. *Wang*, 2024 WL 324789, at *4 (citing *Barfield*, 537 F.3d at 142); *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 71–72 (2d Cir. 2003). However, "[i]t is 'rarely appropriate' to

determine joint employer status at the summary judgment stage . . . 'because of the inquiry's fact-intensive character.'" *Lazaar v. Anthem Cos., Inc.*, No. 22-CV-3075 (JGK), 2023 WL 405016, at *4 (S.D.N.Y. Jan. 25, 2023) (citing *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 941 (S.D.N.Y. 2013)); *see also Barfield*, 537 F.3d at 143–44; *Zheng*, 355 F.3d at 76 n.13. Put another way, "[t]he question of whether any [d]efendant is an FLSA 'employer' is a mixed question of law and fact, involving the application of a legal standard to a particular set of facts", which is "especially well-suited for jury determination" and "rarely suitable for summary judgment." *Jaramillo*, 2023 WL 8828823, at *3.

PDN urges the court to grant summary judgment in its favor because Plaintiffs have not proved their theory of joint liability. PDN Mem., ECF No. 116-1 at 5–8. However, summary judgment is not appropriate in this case under either the formal control factors or the functional control factors.

### a. Formal control

For the formal control test, courts consider the "economic reality" of the employment relationship by analyzing "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Barfield*, 537 F.3d at 142 (2d Cir. 2008) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). These *Carter* factors do not "comprise a rigid rule for the identification of an FLSA employer," but rather "provide a nonexclusive and overlapping set of factors to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA." *Irizarry v. Catsimatidis*, 722 F.3d 99, 105 (2d Cir. 2013) (cleaned up).

Applying these factors, for the same reasons as above, there is a genuine dispute of material fact as to whether PDN had the power to hire and fire NAPW employees, whether PDN supervised and controlled employee work schedules or conditions of employment, whether PDN determined the rate and method of payment, and whether PDN maintained employment records for NAPW's employees. *Id.* at 104 (quoting *Carter,* 735 F.2d at 12).

As to the first *Carter* factor, there is some evidence to support the assertion that PDN had power to hire and fire NAPW employees. Perhaps most strikingly, NAPW wrote to its employees post-2014 merger that "[p]art of the merger process is to *formally hire each of you as a PDN employee*." (ECF No. 113-9 at 16 (Mortillaro Decl.) (emphasis added).) However, Plaintiffs do not offer any other evidence to show that PDN continued to be involved with the day-to-day hiring and firing processes at NAPW other than the mass "hiring" that took place as part of the 2014 merger. Testimony of opt-in Plaintiffs Bayne, Farris, Bourassa, Baker, Harris, and Canas, in fact, show that Plaintiffs submitted applications to and were hired by NAPW representatives, not PDN. (PDN 56.1 Stmt., ECF No. 116-2 ¶¶ 28–33.) While this testimony does not necessarily prove that PDN lacked power to hire and fire employees at NAPW, it suggests that the record is inconclusive as to this first *Carter* factor.

For the second factor of supervision and control, PDN argues that it did not supervise and control employee work schedules or conditions of employment at NAPW. (PDN Mem., ECF No. 116-1 at 6.) For example, NAPW stated in its responses to Plaintiffs' interrogatories that "[s]chedules of NAPW personnel were set by their respective sales managers [at NAPW]." (ECF No. 114-5 (NAPW Ans. to Interr. No. 11).) Plaintiffs do not disagree that they reported to work at NAPW's Garden City, New York and Century City, California locations, and for those working from home, that NAPW supplied all equipment and resources. (Pls.' Opp. 56.1

Stmt., ECF No. 117-1 ¶¶ 40–45.)  However, Plaintiffs point out flaws in Defendants' citations to the record as to their supervisors.  (Pls.' Opp. 56.1 Stmt., ECF No. 117-1 ¶¶ 62–66.)  For example, PDN states that Plaintiff Harris "reported directly to a NAPW supervisor," but Harris testified as to her supervisor's name, not whether that supervisor was a manager working for NAPW or PDN. (ECF No. 116-12 at 31:6–8 (Harris Dep.).)    The record is therefore unclear whether Plaintiffs report to only NAPW supervisors.

The third *Carter* factor of determining the rate and method of payment is also disputed in the record.  Plaintiff Bourassa's 2016 paystubs and W-2 forms list "NAPW Inc." as the corporate entity issuing the checks, located at PDN's Chicago corporate address, not NAPW's New York address.  (ECF No. 116-16 at 2 (Bourassa Paystubs).)  This may be explained by the undisputed fact that NAPW vacated its New York office and moved to PDN's offices in mid-2018.  (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 27 ¶¶ 74–75.)  However, it still raises questions as to who was processing payments for Plaintiffs in 2016.  Plaintiffs submit one sample check from David Mecklenburger, the CFO for PDN from July 2013 to at least March 2016, who signed a check on behalf of NAPW in 2015.  (ECF No. 113-11 at 5 (Hoffman Decl.).)  The Court finds that the record contains many similar inconsistencies that a factfinder is best positioned to assess.

Finally, the record contains disputed facts as to the fourth factor of whether PDN maintained employment records.  Similar to the above, Defendants argue that NAPW, not PDN, "maintained their time records and employment files, issued their W-2 wage statements, and controlled all significant aspects of Plaintiffs' employment."  (Defs.' Opp., ECF No. 114 at 14.)  On the other hand, Plaintiffs claim that "NAPW did not always maintain its own employment records" and note the 2018 office move, during which "NAPW's employee files

were 'boxed and shipped' to [PDN's] Chicago Office." (Pls.' Reply 56.1 Stmt., ECF No. 115-1 ¶ 36.)

In short, there are genuine disputes as to material facts regarding whether PDN exercised formal control over Plaintiffs. Accordingly, the Court respectfully recommends denying summary judgment regarding PDN's status as Plaintiffs' employer pursuant to the formal control prong of the joint employer analysis.

### b.    Functional control

Courts may also consider "whether an entity that lacked formal control over workers—as defined by the four *Carter* factors—could nevertheless be considered their employer based on its exercise of functional control." *Barfield*, 537 F.3d at 143. To assess a putative employment relationship on a theory of functional control, courts consider the following factors:

> (1) whether the putative employer's premises and equipment were used for the plaintiff's work, (2) whether the entities or individuals that contracted work from the putative employer had a business that shifted from one putative joint employer to another, (3) the extent to which a plaintiff performed a discrete line-job that was integral to the putative joint employer's process of production, (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes, (5) the degree to which the putative joint employer or its agents supervised the plaintiff's work, and (6) whether the plaintiff worked exclusively or predominantly for the putative joint employer.

*Dacas v. Duhaney*, No. 17-CV-3568 (EK)(VMS), 2022 WL 5422709, at *9 (E.D.N.Y. Aug. 11, 2022), *adopted by* 2022 WL 4483188 (E.D.N.Y. Sept. 27, 2022) (citing *Zheng*, 355 F.3d at 72).

Here, only the first, fifth, and sixth factors are applicable. The first factor asks whether the putative employer's "premises and equipment" were used for plaintiff's work. As stated earlier, Plaintiffs admit that they reported to work at NAPW's offices in New York and

California and that NAPW, not PDN, supplied all equipment and resources for employees who are working from home. (Pls.' Opp. 56.1 Stmt., ECF No. 117-1 ¶¶ 40–45.) Therefore, the first factor weighs against PDN exercising "functional control" over Plaintiffs. As to the fifth factor, or the "degree to which the putative joint employer or its agents supervised the plaintiff's work," this factor cannot be determined as a matter of law for the same reasons stated in the single integrated enterprise analysis. (*See* § III.A.1.b., *supra* (discussing Plaintiff Bayne's unclear testimony as to whether she reported to any PDN supervisors, in addition to reporting to multiple NAPW supervisors).) Lastly, the sixth factor of whether Plaintiffs worked "exclusively or predominantly" for PDN also cannot be determined as a matter of law. There remain genuine disputes of material facts as to whether PDN was primarily responsible for Plaintiffs' paychecks, or whether NAPW or PDN was responsible for hiring and fee schedules, to name a few examples. (*See* § III.A.1.a.–b., *supra*.) For these reasons, PDN's status as Plaintiffs' employer cannot be determined at the summary judgment stage after analyzing the functional control factors.

"In order to grant summary judgment for [Plaintiffs], the District Court would have to conclude that, even where both the historical facts and the relevant factors are interpreted in the light most favorable to [PDN], [Plaintiffs] are still entitled to judgment as a matter of law." *Zheng*, 355 F.3d at 76. Because of the fact-intensive nature of this analysis and the disputed facts identified above, the Court respectfully recommends denying Plaintiffs' motion for partial summary judgment as to PDN's status as Plaintiffs' employer under the joint employer theory.

**B.     PDN's Status as Plaintiffs' Employer Under the NYLL**

The NYLL defines "employer" to include "any person . . . employing any individual in any occupation, industry, trade, business or service" or "any individual . . . acting as employer." *Jin Dong Wang v. LW Rest., Inc.*, 81 F. Supp. 3d 241, 258 (E.D.N.Y. 2015) (citing N.Y. Lab. Law §§ 190(3), 651(6), and *Irizarry*, 722 F.3d at 117).  Courts in this Circuit "have interpreted the definition of 'employer' under the New York Labor Law coextensively with the definition used by the FLSA."  *Id.* at 258 (citing *Spicer v. Pier Sixty LLC*, 269 F.R.D. 321, 335 n.13 (S.D.N.Y. 2010)).  However, the question of whether "the tests for 'employer' status are the same under the FLSA and the NYLL . . . has not been answered by the New York Court of Appeals."  *Irizarry*, 722 F.3d at 117; *see Spiciarich v. Mexican Radio Corp.*, No. 14-CV-9009 (SHS), 2015 WL 4191532, at *5 n.5 (S.D.N.Y. July 10, 2015) (collecting cases in which courts either applied or rejected single integrated employer theory).  Therefore, "[c]ourts regularly apply both tests under the NYLL as well as under the FLSA to determine whether entities are part of a single-integrated enterprise or joint employers."  *Jaramillo*, 2023 WL 8828823, at *7 (collecting cases).

Here, Defendants do not dispute that NAPW falls within the definition of employer under the FLSA.  (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 5 ¶ 11.)  However, for the same reasons stated in the FLSA coverage analysis, the Court respectfully recommends that Plaintiffs' motion for partial summary judgment should be denied as to PDN's status as Plaintiffs' employer under the NYLL.  (*See* § III.A., *supra*.)

## C.      NAPW's Liability[8]

### 1.      FLSA and NYLL Overtime Wages

Plaintiffs argue that Defendants failed to pay overtime compensation under the FLSA

and NYLL.  (Pls.' Mem., ECF No. 113-1 at 22.)  Specifically, they argue that Defendants

failed to comply with their recordkeeping obligations and therefore cannot show that they paid

Plaintiffs overtime wages.  (*Id.* at 23–25.) Defendants assert that Plaintiffs are stating incorrect

facts and that they did pay employees overtime for any hours worked over 40 hours per week.

(Defs.' Opp., ECF No. 114 at 15.)

The "FLSA requires that, 'for a workweek longer than forty hours,' an employee who

works 'in excess of' forty hours shall be compensated for that excess work 'at a rate not less

than one and one-half times the regular rate at which he is employed' (*i.e.*, time and a half)."

*Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013) (quoting

29 U.S.C. § 207(a)).  The NYLL includes the same requirement, providing that eight hours

constitute a "legal day's work," N.Y. Lab. Law § 160, and that "[a]n employer shall pay an

employee for overtime at a wage rate of one and one-half times the employee's regular rate[.]"

12 N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.  *"*Plaintiffs must provide sufficient detail

about the length and frequency of their unpaid work to support a reasonable inference that they

worked more than forty hours in a given week."  *Nakahata v. New York-Presbyterian Health*

*Care Sys., Inc.*, 723 F.3d 192, 201 (2d Cir. 2013).

"At summary judgment, if an employer's records are inaccurate or inadequate, an

employee need only present 'sufficient evidence to show the amount and extent of [the

---

[8] Because the Court recommends denial of Plaintiffs' motion for partial summary judgment as to
PDN's liability, the discussion of liability and damages in this section pertains to NAPW only.

uncompensated work] as a matter of just and reasonable inference.'" *Kuebel v. Black &*

*Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011).   A plaintiff may "meet this burden through

estimate based on his own recollection." *Id.*   Similarly, under New York law, if an employer

fails to keep adequate records or provide wage statements, the employer bears the burden "of

proving that the complaining employee was paid wages, benefits and wage supplements."

N.Y. Lab. Law § 196-a.

Here, Defendants concede that they do not possess payroll records from 2012 to

present, and their corporate representative's testimony is consistent with this admission.   (ECF

No. 113-13 at 94 (Bzdyl Decl.); Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 29–30 ¶ 81.)   In

contrast, Plaintiff Bayne and six other employees declare under oath that they were not paid

overtime compensation when they worked more than 40 hours in a week.   (Pls.' 56.1 Stmt.,

ECF No. 113-2 ¶¶ 82–83; *see also* ECF Nos. 113-6–113-12 (declarations of Plaintiffs Bayne,

Dotson, Farris, Mortillaro, Tsimicalis, Hoffman & McGrath).)   Because Defendants lack

adequate records to show whether Plaintiffs received overtime compensation, Plaintiffs'

recollections are sufficient to show the amount and extent of uncompensated work.   *See*

*Kuebel*, 643 F.3d at 362; N.Y. Lab. Law § 196-a.[9]

---

[9] Additionally, Plaintiffs provide summary exhibits reflecting log times in Exhibits W, Y, BB, CC, DD, EE, and FF annexed to the Declaration of Jack L. Newhouse in support of Plaintiff's motion for summary judgment.   (*See* ECF Nos. 113-26, 113-28, 113-31, 113-32, 113-33, 113-34, 113-35.) Defendants object to these summary records on the basis that they are "unauthenticated document[s], with no author, date, nor was same produced in discovery."   (*See* Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 33–37 ¶¶ 96–108 & at 38–40 ¶¶ 110–117.)   The Court disagrees.   Under Federal Rule of Evidence 1006, a party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."   Fed. R. Evid. 1006.   Here, Plaintiffs' summary exhibits were based on the CRM Log data produced by Defendants during discovery.   (ECF No. 113-3 ¶ 88 (Newhouse Decl.).)   Because the underlying documents are admissible and have been made available to Defendants, Plaintiffs'

Defendants' only rebuttal to Plaintiffs' recollections is that "there are no citations to the record that reflect unpaid overtime wages." (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 30 ¶¶ 82–83.) But "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Chang*, 2022 WL 4586100, at *4. This is particularly applicable here, given that Plaintiffs did cite to testimony about their recollections, which is sufficient to show unpaid overtime wages.

Therefore, Plaintiffs have shown that NAPW failed to pay overtime compensation as required under the FLSA and NYLL. Accordingly, the Court respectfully recommends granting Plaintiffs' motion for summary judgment as to NAPW's liability under the FLSA and NYLL for failure to pay overtime compensation.

### 2. NYLL Wage Statement Violations[10]

Plaintiffs argue that Defendants failed to comply with NYLL § 195(3) with respect to each member of the Rule 23 Class because the wage statements did not reflect the hours Plaintiffs worked, Plaintiffs' regular rates of pay, or Plaintiffs' overtime rates of pay. (Pls.' Mem., ECF No. 113-1 at 29–30.) Defendants respond that "Plaintiffs were paid the correct

---

summary exhibits are admissible and reviewable for purposes of summary judgment. *See Tamarin v. Adam Caterers*, 13 F.3d 51, 53 (2d Cir. 1993).

[10] In light of the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), courts in this Circuit have held that plaintiffs lack standing to bring wage notice and statement claims under the NYLL absent any concrete injury-in-fact. *Esquivel v. Lima Rest. Corp.*, No. 20-CV-2914 (ENV)(MMH), 2023 WL 6338666, at *10 (E.D.N.Y. Sept. 29, 2023) (collecting cases), *adopted by* Order Adopting R. & R., *Esquivel v. Lima Rest. Corp.*, No. 20-CV-2914 (ENV)(MMH) (Nov. 30, 2023). The motions at consideration here are for summary judgment, not motions to dismiss, and Defendants do not raise the standing issue. The Court may find wage notice and statement violations on summary judgment. *See, e.g.*, *Hwangbo v. Kimganae, Inc.*, No. 19-CV-6356 (DLI)(SJB), 2023 WL 2710669, at *12 (E.D.N.Y. Mar. 30, 2023).

amounts as reflected when dividing the pay provided in accordance with the wage formula for each employee." (Defs.' Opp., ECF No. 114 at 18.)

Pursuant to the New York Wage Theft Protection Act ("WTPA"), employers must "provide employees with 'a statement with every payment of wages,' listing various information including the dates of work covered by the payment, information identifying the employer and employee, details regarding the rate of pay and the overtime rate of pay, and the number of hours worked." *Perry v. High Level Dev. Contracting & Sec. LLC*, No. 12-CV-2180 (AMD)(PK), 2022 WL 1018791, at *8 (E.D.N.Y. Mar. 16, 2022) (quoting N.Y. Lab. Law § 195(3)). Failure to provide a wage statement enables a plaintiff to recover $250 per day up to a maximum of $5,000. N.Y. Lab. Law § 198(1-d).[11]

There is no genuine dispute of material fact regarding whether NAPW complied with the notice requirements of the WTPA. Plaintiffs rely on that their weekly paystubs, which did not reflect the hours they worked, instead stating either no information at all, "40" hours per week in a weekly pay period, or "86.67" hours in a semimonthly pay period. (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 41 ¶ 119 (citing ECF No. 113-7 at 6 (Dotson Decl.) (paystubs show "40" hours or "86.67"); ECF No. 113-8 at 6 (Farris Decl.) (paystubs show no hours or "40" hours); ECF No. 113-9 at 10 (Mortillaro Decl.) (paystubs show no hours or "40" hours); ECF No. 113-11 at 5 (Hoffman Decl.) (paystubs show no hours or "40" hours); ECF No. 113-24

---

[11] In 2011, the WTPA awarded a maximum of $2,500 in damages to employees who were not provided with compliant notices. *Hwangbo*, 2023 WL 2710669, at *11. The WTPA was amended on December 29, 2014, effective February 27, 2015 ("2014 Amendment"), which increased damages to a maximum of $5,000. *Id.* Here, because Plaintiffs were employed "both before and after" the 2014 Amendment's effective date, Plaintiffs may seek a maximum of $5,000 in damages. *See id.*

(Bayne Payroll Summaries); ECF No. 113-26 (select portions of Payroll Summaries for 36 class members reflecting same).)

Defendants attempt to rebut Plaintiffs' evidence by pointing out one paystub showing one employee's payment of one hour of overtime. (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 41 ¶ 119 (citing to ECF No. 113-9 at 10 (Mortillaro Decl.).) But this alone is insufficient to show that *all* Plaintiffs' paystubs accurately reflected hours worked on a regular basis. In fact, the paystub that Defendants cite does not even list hours worked in the "hours" column. (ECF No. 113-9 at 10 (Mortillaro Decl.).) Moreover, Bzdyl, Defendants' corporate representative, admitted that he saw "no indication or line item of overtime" after reviewing the payroll register for Plaintiff Bayne. (ECF No. 113-13 at 82:14–83:8 (Bzdyl Dep.).) Defendants' rebuttal to this testimony was that Bzdyl's statement related only to the specific week of January 8. (Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 41–42 ¶ 120.) At the same, Defendants failed to provide evidence of other time periods that indicated overtime wage statements.

Thus, the Court respectfully recommends granting Plaintiffs' motion for partial summary judgment as to NAPW's violation of the NYLL wage statement requirement.

### 3. Statute of Limitations Under the FLSA[12]

Plaintiffs argue that the statute of limitations for their FLSA claim should be three years because Defendants' violation of the FLSA overtime requirement was willful. (Pls.' Mem., ECF No. 113-1 at 27–28.) Defendants argue that Plaintiffs should not receive the benefit of

---

[12] The parties do not dispute the applicable statute of limitations under the NYLL. The statute of limitations under the NYLL is six years and does not require a showing of willfulness. N.Y. Lab. Law §§ 198(3), 663(3); *Rivera v. Harvest Bakery Inc.*, No. 13-CV-691 (ADS)(AYS), 2018 WL 4214337, at *8 (E.D.N.Y. Aug. 17, 2018), *adopted by* 2018 WL 4211301 (E.D.N.Y. Sept. 4, 2018).

the three-year exception because Plaintiffs received full wages based on the time records, and therefore, there was no willful violation. (Defs.' Opp., ECF No. 114 at 17.)

"The limitations period for FLSA claims is two years, 'except that a cause of action arising out of a willful violation may be commenced within three years.'" *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 320 (2d Cir. 2021) (quoting 29 U.S.C. § 255(a)). "An employer willfully violates the FLSA when it 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by' the Act"; negligence alone is insufficient to show a willful violation. *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988), and citing *Herman v. RSR Sec. Svcs. Ltd.*, 172 F.3d 132, 141 (2d Cir. 1999)).

Here, it is undisputed that the Consent Judgment permanently enjoined NAPW and restrained it from violating the FLSA by requiring NAPW and Proman to pay overtime compensation to their employees and to keep adequate records of hours worked. (Pls.' 56.1 Stmt., ECF No. 113-2 ¶ 125; Defs.' Opp. 56.1 Stmt., ECF No. 114-1 at 43 ¶ 125; ECF No. 113-37 (U.S. Dep't of Labor Consent Judgment).) NAPW was thus aware of the requirement to pay overtime compensation and had been cautioned of the consequences of failure to do so. *Rojas v. Splendor Landscape Designs Ltd.*, 268 F. Supp. 3d 405, 411 (E.D.N.Y. 2017) ("Having been advised by the DOL of their violation of the FLSA—and in the first investigation, being ordered to pay back wages—Defendants were clearly on notice that the failure to pay overtime wages violated the FLSA. Yet, Defendants continued to commit the same violation.") Accordingly, there is no genuine dispute of material fact as to NAPW's willful violation of the FLSA. Therefore, the Court respectfully recommends granting Plaintiffs' motion for partial summary judgment regarding NAPW's willful failure to pay

overtime wages and extending the statute of limitations for Plaintiffs' FLSA claim from two years to three years.

### D. Damages

#### 1. Liquidated Damages

Plaintiffs assert that they are entitled to liquidated damages because Defendants cannot show that they acted in subjective good faith with objectively reasonable grounds for not paying overtime compensation to Plaintiffs. (Pl.'s Mem., ECF No. 113-1 at 28.) Plaintiffs provide the standards for liquidated damages under the FLSA and NYLL but do not specify under which statute they are seeking liquidated damages. (*See id.*) Defendants respond that NAPW paid all applicable wages and recorded Plaintiffs' time properly. (Defs.' Opp., ECF No. 114 at 17.)

"Under both the FLSA and NYLL, an employee may recover liquidated damages equal to the amount owed for unpaid overtime compensation, unless the employer proves a good faith basis for believing that its underpayment of wages was in compliance with the law." *Perry*, 2022 WL 1018791, at *11 (citing 29 U.S.C. §§ 216(b), 260; N.Y. Lab. Law § 198(1-a)). "The employer bears the burden of demonstrating 'good faith,' which requires a showing that 'it took active steps to ascertain the dictates of the FLSA and then to comply with them.'" *Rojas*, 268 F. Supp. 3d at 411 (quoting *Barfield*, 537 F.3d at 150). If the employer can show that its "act or omission giving rise to [the FLSA] action was in good faith and [the employer] had reasonable grounds for believing it was not a violation of the [FLSA]," then a court may deny or reduce liquidated damages accordingly. *See* 29 U.S.C. § 260.

Similarly, the NYLL enables courts to award "liquidated damages equal to one hundred percent of the total amount of wages found to be due," unless the employer proves "a good

faith basis to believe that its underpayment of wages was in compliance with the law." N.Y. Lab. Law §§ 198(1-a), 663(1). Despite the differences in statutory language, courts have not substantively distinguished the federal standard from the current state standard of good faith. *See Inclan v. New York Hosp. Grp., Inc.*, 95 F. Supp. 3d 490, 505 (S.D.N.Y. 2015) (holding that the "meaning of willfulness under the NYLL's liquidated damages provision was considered to be the same as willfulness under the FLSA[.]"). As such, an award of liquidated damages under the FLSA is sufficient to satisfy the liquidated damages provision of the NYLL. *See Rojas*, 268 F. Supp. 3d at 412; *see also Rivera*, 2018 WL 4214337, at *8 ("cumulative damages are no longer available under both the FLSA and NYLL").

Here, there is no genuine issue of material fact regarding NAPW's willful failure to pay overtime compensation, and NAPW cannot show that it had a good faith basis for not paying overtime wages. (*See* § III.C.2–3, *supra*.) Accordingly, the Court respectfully recommends granting Plaintiffs' motion for partial summary judgment regarding liquidated damages against NAPW under the NYLL.

## 2. Prejudgment Interest

Plaintiffs contend they are also entitled to prejudgment interest under the NYLL in an amount to be determined, without providing additional argument. (Pl.'s Mem., ECF No. 113-1 at 28–29.) Defendants respond that because Plaintiffs have not proved any overtime wage violations, they are not entitled to prejudgment interest. (Defs.' Opp., ECF No. 114 at 17–18.)

The NYLL enables a plaintiff to recover both liquidated damages and prejudgment interest. *Fermin v. Las Delicias Peruanas Rest., Inc.*, 93 F. Supp. 3d 19, 48 (E.D.N.Y. 2015). "[P]rejudgment interest is only available for unpaid wage amounts, not for damages awarded for failure to provide wage notices and statements." *Calle v. Pizza Palace Cafe LLC*, No. 20-

CV-4178 (LDH)(LB), 2022 WL 609142, at *12 (E.D.N.Y. Jan. 4, 2022), *adopted by* Order

Adopting R. & R., *Calle v. Pizza Palace Cafe LLC*, No. 20-CV-4178 (LDH)(LB) (E.D.N.Y.

Jan. 27, 2022).  Here, because the Court recommends awarding liquidated damages under the

NYLL, awarding prejudgment interest is permissible.  *Fermin*, 93 F. Supp. 3d at 48.  Thus, the

Court respectfully recommends granting Plaintiffs' motion for summary judgment with respect

to prejudgment interest for unpaid overtime wages for NAPW.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Court respectfully recommends that Plaintiffs' motion

for partial summary judgment at ECF No. 113 should be **granted** regarding: (1) NAPW's

liability for unpaid overtime wages under the FLSA and NYLL, (2) NAPW's failure to provide

accurate wage statements under the NYLL, (3) NAPW's willful violation of the FLSA and the

NYLL, (4) liquidated damages, and (5) prejudgment interest; and **denied** related to PDN's

liability for all claims.  The Court further respectfully recommends that PDN's motion for

summary judgment at ECF No. 116 should be **denied**.

A copy of this Report and Recommendation is being served on the parties via ECF.

Within 14 days of service, a party may serve and file specific written objections to this Report

and Recommendation.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  Any requests for an

extension of time to file objections shall be directed to Judge Brodie.  If a party fails to object

timely to this Report and Recommendation, it waives any right to further judicial review of this decision.  *See Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022).

**SO ORDERED.**

Brooklyn, New York
February 6, 2024

/s/Marcia M. Henry
MARCIA M. HENRY
United States Magistrate Judge