UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------

DEBORA BAYNE, *and all other persons similarly
situated*,

                                Plaintiffs,

                        v.

NAPW, INC. d/b/a NATIONAL ASSOCIATION
OF PROFESSIONAL WOMEN d/b/a
INTERNATIONAL ASSOCIATION OF WOMEN,
and PROFESSIONAL DIVERSITY NETWORK,
INC. d/b/a NATIONAL ASSOCIATION OF
PROFESSIONAL WOMEN d/b/a
INTERNATIONAL ASSOCIATION OF WOMEN,

                            Defendants.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
18-CV-3591 (MKB) (MMH)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Debora Bayne commenced the above-captioned action on June 20, 2018, against

Defendants NAPW, Inc. ("NAPW"), doing business as National Association of Professional

Women and doing business as International Association of Women, and Professional Diversity

Network, Inc. ("PDN"), doing business as National Association of Professional Women and

doing business as International Association of Women,[1] alleging violations of the Fair Labor

Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), and the New York Labor Law §§ 190 *et seq.*

and 650 *et seq.* ("NYLL").  (Compl., Docket Entry No. 1.)  Then-Magistrate Judge Ramon E.

Reyes, Jr. granted certification of an FLSA collective action pursuant to 29 U.S.C. § 216(b) on

November 29, 2018, (Summ. Order, Docket Entry No. 26), and subsequently recommended

---

[1]  Defendants admit that "PDN and its subsidiaries [*e.g.*, NAPW] operate online
professional networking communities, including but not limited to a network called the
International Association of Women."  (Defs.' Answer ¶ 13, Docket Entry No. 14.)

certification of a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, which the Court adopted on October 15, 2021, (Order Adopting Report & Recommendation, Docket Entry No. 93).  On October 21, 2022, Plaintiffs moved for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and PDN cross-moved for summary judgment.[2]  On November 3, 2022, the Court referred the parties' motions to Magistrate Judge Marcia M. Henry for a report and recommendation.  (Order dated Nov. 3, 2022.)

By report and recommendation dated February 6, 2024, Judge Henry recommended that the Court (1) grant Plaintiffs' motion as to (i) NAPW's liability for unpaid overtime wages under the FLSA and the NYLL, (ii) NAPW's failure to provide accurate wage statements under the NYLL, (iii) NAPW's willful violation of the FLSA and the NYLL, (iv) liquidated damages, and (v) prejudgment interest; (2) deny Plaintiffs' motion as to PDN's liability for all claims; and (3) deny PDN's motion for summary judgment (the "R&R").  (R&R 31, Docket Entry No. 122.) PDN filed an objection to the R&R on February 21, 2024, and Plaintiff responded to PDN's objections on March 6, 2024.[3]

For the reasons discussed below, the Court grants in part and denies in part Plaintiffs' motion for partial summary judgment and denies PDN's motion for summary judgment.

---

[2]  (Pls.' Mot. for Partial Summ. J. ("Pls.' Mot."), Docket Entry No. 113; Pls.' Mem. in Supp. of Pls.' Mot. ("Pls.' Mem."), Docket Entry No. 113-1; Defs.' Mem. in Opp'n to Pls.' Mot ("Defs.' Opp'n"), Docket Entry No. 114; Pls.' Reply Mem. in Supp. of Pls.' Mot. ("Pls.' Reply"), Docket Entry No. 115; PDN's Mot. for Summ. J. ("PDN's Mot."), Docket Entry No. 116; PDN's Mem. in Supp. of PDN's Mot. ("PDN's Mem."), Docket Entry No. 116-1; Pls.' Mem. in Opp'n to PDN's Mot. ("Pls.' Opp'n"), Docket Entry No. 117; PDN's Reply Mem. in Supp. of PDN's Mot. ("PDN's Reply"), Docket Entry No. 118; Pls.' 56.1 Stmt. ("Pls.' 56.1"), Docket Entry No. 113-2; Defs.' Resp. to Pls.' 56.1 ("Defs.' 56.1 Resp."), Docket Entry No. 114-1; Pls.' 56.1 Counter-Stmt., Docket Entry No. 115-1; PDN's 56.1 Stmt. ("PDN's 56.1"), Docket Entry No. 116-2; Pls.' Resp. to PDN's 56.1 ("Pls.' 56.1 Resp."), Docket Entry No. 117-1.)

[3]  (PDN's Objs. to the R&R ("PDN's Objs."), Docket Entry No. 123; Pls.' Resp. to PDN's Objs. ("Pls.' Resp."), Docket Entry No. 125.)

## I.    Background

### a.    Factual background

#### i.    The parties

Plaintiffs are sales representatives, located in various states including California, Illinois, and New York, that used telephones and computers to sell memberships to a networking organization, the International Association of Women,[4] to individuals throughout the country.[5] (Defs.' 56.1 Resp. ¶¶ 4, 12.)  At all relevant times, Plaintiffs were employed by and under the control of NAPW.  (*Id.* ¶ 11.)

Defendants NAPW and PDN, both doing business as the International Association of Women, are Delaware corporations with principal places of business at 801 West Adams Street, Suite 600, Chicago, Illinois, 60607.  (Pls.' 56.1 Resp. ¶¶ 3–4.)

#### ii.    The consent judgment

In February of 2012, the U.S. Department of Labor, NAPW, and Matthew Proman, NAPW's founder, president, and Chief Executive Officer ("CEO"), executed a consent judgment, which permanently enjoined NAPW and Proman from violating the FLSA and federal record-keeping regulations (the "Consent Judgment").  (Defs.' 56.1 Resp. ¶ 6.)  The Consent Judgment ordered NAPW and Proman to pay their employees overtime wages and to preserve adequate records of their employees and their hours worked.  (*Id.* ¶¶ 6, 125.)

#### iii.    Defendants' corporate structure and operations

In September of 2014, NAPW merged with its predecessor, the former corporate entity responsible for operating the networking group and employing sales representatives.  (*Id.* ¶¶ 14–

---

[4]  Prior to its rebranding in February of 2018, the International Association of Women ("IAW") was known as NAPW.  (Pls.' 56.1 ¶ 13; Defs.' 56.1 Resp. ¶ 13.)

[5]  The following facts are undisputed unless otherwise noted.

15.)  NAPW accepted the obligations of its predecessor, whose registration with the New York Department of State became inactive and ceased to exist.  (*Id.* ¶¶ 17–19.)  Since the merger, NAPW has been a wholly owned subsidiary of PDN.  (*Id.* ¶ 16.)

Following the merger, PDN hired some NAPW executives.  For example, Proman became PDN's Executive Vice President, Chief Operating Officer ("COO"), and Director; (*id.* ¶ 20); and Katherine Butkevich, NAPW's Chief Financial Officer ("CFO") from 2012 to 2014, served as PDN's CEO from March of 2016 until December of 2016, when she became NAPW's CEO, (*id.* ¶¶ 54–56).  Some PDN executives performed duties involving NAPW and PDN.  For example, David Mecklenburger, the CFO for PDN from July of 2013 to March of 2016, signed at least one paycheck issued by NAPW to NAPW's sales representatives.  (*Id.* ¶ 43.)  In addition, Joseph Bzdyl, the Executive Vice President of PDN since January of 2017, served as the Rule 30(b)(6) corporate representative for the depositions of both NAPW and PDN in this case.  (*Id.* ¶ 46.)

### iv.  Plaintiffs' work hours and payments

Plaintiff Bayne and six additional NAPW sales representatives, who worked for NAPW in New York from 2009 through 2019, received salaries for forty hours per week plus commissions and bonuses during their employment.  (*Id.* ¶ 82.)  As NAPW sales representatives, Plaintiffs were to be paid weekly wages of $500 (a rate of $12.50 per hour), plus commissions and overtime compensation.  (*Id.* ¶¶ 76–77; *see id.* ¶ 122 ("For regular rate, Plaintiffs' paystubs were blank or reflected $12.50 per hour.").)  Plaintiffs contend they were not paid overtime compensation when they worked over forty hours in a week, which Defendants dispute.  (*Id.* ¶ 83.)  Defendants admit that they do not possess any payroll records from 2012 to 2015.  (*Id.* ¶ 81.)  Plaintiffs produced payroll records from at least February of 2013 through March of 2019, but only one of the several records produced for a single plaintiff for the pay period of February

9 through February 15, 2013, reflects the payment of overtime compensation paid by Defendants during the relevant statutory period.[6]  (*Id.* ¶¶ 84–86; *see also* Mortillaro Earning Stmts. 10.)

###    b.   Procedural background

On June 20, 2018, Bayne commenced this action.  (Compl.)  By order dated November 29, 2018, Judge Reyes granted certification of an FLSA collective action consisting of "[a]ll current and former employees of [NAPW] and [PDN] who worked as sales representatives selling memberships to the National Association of Professional Women or International Association of Women from [THREE YEARS PRIOR TO THE ORDER] through the present."  (Summ. Order 8.) On August 10, 2021, Judge Reyes recommended that the Court grant certification of a class action consisting of "[a]ll individuals employed in New York from June 20, 2012 to the present by [NAPW] and [PDN] to sell memberships to the women's networking organization known as National Association of Professional Women and the International Association of Women," not including "[c]orporate officers, shareholders, directors and administrative employees."  (Report & Recommendation 21, Docket Entry No. 90.)  The Court adopted the report and recommendation in its entirety on October 15, 2021.  (Order Adopting Report & Recommendation 3.)  The Court ordered Defendants "to produce to Plaintiffs a list of all class members, including names and last known addresses."  (*Id.*)  Opt-in Plaintiffs subsequently joined the action.  (Consent Forms, Docket Entry Nos. 99, 101, 102.)

---

[6]  (Decl. of Sebastiana Mortillaro ("Mortillaro Decl."), annexed to Pls.' Mot. as Ex. 9, Docket Entry No. 113-9; Mortillaro Earning Stmts., annexed to Mortillaro Decl. as Ex. 2.) Because the internal pagination of the exhibits within Plaintiffs' individual declarations differs by exhibit, the Court refers to the page numbers assigned by the electronic filing system.  (*See* Mortillaro Decl.; Decl. of Melanie Farris ("Farris Decl."), annexed to Pls.' Mot. as Ex. E, Docket Entry No. 113-8; Decl. of Susan Hoffman ("Hoffman Decl."), annexed to Pls.' Mot. as Ex. H, Docket Entry No. 113-11; Reply Decl. of Marisa Dotson ("Dotson Reply Decl."), annexed to Pls.' Reply, Docket Entry No. 115-3.)

c.   **The R&R**

Judge Henry recommended that the Court (1) grant Plaintiffs' motion as to (i) NAPW's liability for unpaid overtime wages under the FLSA and the NYLL, (ii) NAPW's failure to provide accurate wage statements under the NYLL, (iii) NAPW's willful violation of the FLSA and the NYLL, (iv) liquidated damages, and (v) prejudgment interest; (2) deny Plaintiffs' motion as to PDN's liability for all claims; and (3) deny PDN's motion for summary judgment.  (R&R 31.)

With respect to NAPW's liability, Judge Henry recommended that the Court grant Plaintiffs' motion for partial summary judgment as to all claims.  First, Judge Henry found that Plaintiffs "have shown that NAPW failed to pay overtime compensation as required under the FLSA and [the] NYLL" because "Defendants lack adequate records to show whether Plaintiffs received overtime compensation," and "Plaintiffs' recollections are sufficient to show the amount and extent of uncompensated work."  (*Id.* at 24–25.)  Second, Judge Henry found that "[t]here is no genuine dispute of material fact regarding whether NAPW complied with the notice requirements of the [Wage Theft Protection Act]" because Plaintiffs' weekly paystubs did not reflect the hours they worked and Defendants' highlighting of "one paystub showing one employee's payment of one hour of overtime" is "insufficient to show that *all* Plaintiffs' paystubs accurately reflected hours worked on a regular basis."  (*Id.* at 26–27.)  Third, Judge Henry found that NAPW's violation of the FLSA was willful because, after the Consent Judgment, "NAPW was . . . aware of the requirement to pay overtime compensation and had been cautioned of the consequences of failure to do so."  (*Id.* at 28 (citations omitted).)  Finally, with respect to NAPW's damages, Judge Henry recommended that the Court award liquidated damages and prejudgment interest because "there is no genuine issue of material fact regarding NAPW's willful failure to pay overtime compensation, and NAPW cannot show that it had a good faith basis for not paying overtime wages."  (*Id.* at 29–31.)

With respect to PDN's liability, Judge Henry recommended that the Court deny Plaintiffs' motion for partial summary judgment and deny PDN's motion for summary judgment as to all claims.  (*Id.* at 31.)  Judge Henry found that "there are genuine issues of material fact regarding whether PDN is [Plaintiffs'] employer under the FLSA or the NYLL" under either the single integrated enterprise test or the joint employer test.  (*Id.* at 8–22.)  First, Judge Henry concluded that genuine issues of material fact existed as to whether NAPW and PDN functioned as a single integrated enterprise such that PDN could be held liable for the acts of NAPW.  (*Id.* at 8–16.) Judge Henry concluded that genuine issues of material fact existed as to at least two of the four single integrated enterprise factors: centralized control of labor relations and common management.  (*Id.* at 13–15.)  Second, Judge Henry concluded that genuine disputes of material facts existed regarding whether PDN sufficiently exercised formal or functional control over NAPW or Plaintiffs for Defendants to be considered joint employers.  (*Id.* at 16–22.)  Because "disputed issues of material fact exist regarding PDN's status as Plaintiffs' employer" under either test, Judge Henry recommended denying (1) Plaintiffs' motion for partial summary judgment as to PDN's liability for all claims, and (2) PDN's motion for summary judgment.  (*Id.* at 10, 31.)

### d.  PDN's objections to the R&R

PDN filed a partial objection to the R&R, arguing that Judge Henry erred in recommending that (1) "there is a disputed issue of material fact regarding whether PDN exercised formal or functional control over NAPW and/or its employees for PDN and NAPW to be considered joint employers;" (2) "the single integrated enterprise test is appropriate to use in [the] FLSA and/or NYLL context;" and (3) "there is a disputed issue of material fact regarding whether PDN and NAPW functioned as a single integrated enterprise such that PDN could be held liable for the labor acts of NAPW."  (PDN's Objs. 1.)

## II.  Discussion

### a.  Standards of review

#### i.  R&R

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."  28 U.S.C. § 636(b)(1).  When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected.  *Id.*; *see also United States v. Romano*, No. 15-CR-992, 2022 WL 402394, at *3 (2d Cir. Feb. 10, 2022) (citing *United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015)).  The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record.  *See S.J. v. N.Y.C. Dep't of Educ.*, No. 21-240, 2022 WL 1409578, at *1 n.1 (2d Cir. May 4, 2022) (noting that the district court applied the correct legal standard in conducting *de novo* review of portions of the magistrate judge's report to which specific objections were made and reviewing portions not objected to for clear error).  The clear error standard also applies when a "party makes only conclusory or general objections, or simply reiterates his original arguments." *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022) (quoting *Thomas v. Astrue*, 674 F. Supp. 2d 507, 511 (S.D.N.Y. 2009)); *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 579 (2d Cir. 2020) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002))); Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [magistrate judge's] proposed findings and recommendations.").  Where, however, a party "t[akes] issue with a specific legal conclusion in the report and recommendation," a district court reviews the objected-to portions of the report

and recommendation *de novo*.  *Miller*, 43 F.4th at 120–21 (concluding that the plaintiff's

objection, although revisiting an issue already argued, should have been reviewed *de novo* where

the plaintiff objected to a "specific legal conclusion in the report and recommendation," and

noting that clear error is normally applied "when the objections are nonspecific or 'merely

perfunctory responses . . . argued in an attempt to engage the district court in a rehashing of the

same arguments set forth in the original petition'" (alteration in original) (quoting *Edwards v.

Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006))).

    **ii.   Summary judgment**

       Summary judgment is proper only when "there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Radwan v.

Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (quoting Fed. R. Civ. P. 56(a)).  The court must

"constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan*, 55 F.4th

at 113 (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir.

2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the

party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir.

2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  The role of the court "is not

to resolve disputed questions of fact but only to determine whether, as to any material issue, a

genuine factual dispute exists."  *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021)

(quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A genuine issue of fact

exists when there is sufficient "evidence on which the jury could reasonably find for the

[nonmoving party]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  The "mere

existence of a scintilla of evidence" is not sufficient to defeat summary judgment.  *Id.*  The

court's function is to decide whether, "after resolving all ambiguities and drawing all inferences

in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant."  *Miller v.*

*N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127, 129 (2d Cir. 2013)).

### b.  Unopposed portions of the R&R

No party has objected to Judge Henry's recommendations that the Court grant Plaintiffs' motion as to (i) NAPW's liability for unpaid overtime wages under the FLSA and the NYLL, (ii) NAPW's failure to provide accurate wage statements under the NYLL, (iii) NAPW's willful violation of the FLSA and the NYLL, (iv) liquidated damages, and (v) prejudgment interest. (R&R 31.)  The Court has reviewed the unopposed portions of the R&R and, finding no clear error, adopts Judge Henry's recommendations except with respect to Plaintiffs' claim for failure to provide accurate wage statements under the NYLL, which the Court dismisses without prejudice for lack of subject matter jurisdiction.[7]

### c.  NYLL wage statement claim

Plaintiffs argue that they are entitled to summary judgment on their wage statement claim because "Defendants failed to comply with NYLL § 195(3)" by issuing wage statements to Plaintiffs that "d[id] not reflect the hours Plaintiffs worked, Plaintiffs' regular rates of pay, or Plaintiffs' overtime rates of pay."  (Pls.' Mem. 23–24.)

---

[7]  Although Defendants did not argue that Plaintiffs lack Article III standing, (*see generally* Defs.' Opp'n; PDN's Mem.; PDN's Reply), "federal courts have an independent obligation to resolve any issue about their subject matter jurisdiction *sua sponte* . . . because '[s]tanding is the threshold question in every federal case, determining the power of the court to entertain the suit.'"  *Gross v. TransUnion, LLC*, 607 F. Supp. 3d 269, 270–71 (E.D.N.Y. 2022) (alteration in original) (quoting *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008)); *see also Norton v. Town of Brookhaven*, No. 22-1015, 2023 WL 3477123, at *5 (2d Cir. May 16, 2023) ("[B]ecause it involves a court's power to hear a case, subject matter jurisdiction cannot be forfeited, waived, or conferred by consent of the parties." (alteration in original) (quoting *Platinum-Montaur Life Scis., LLC v. Navidea Biopharmaceuticals, Inc.*, 943 F.3d 613, 617 (2d Cir. 2019)))).  Accordingly, the Court will evaluate whether Plaintiffs have standing to bring an NYLL wage statement claim.

Defendants argue that Plaintiffs are not entitled to summary judgment on this claim because "[t]he NYLL requires employers . . . to provide each employee with accurate wage statements at the time wages are paid" and "Plaintiffs were paid the correct amounts as reflected when dividing the pay provided in accordance with the wage formula for each employee." (Defs.' Opp'n 18 (citing NYLL § 195(3)).)

The NYLL requires employers to give employees a wage statement with each payment of wages. *Avila v. Velasquez Constr. Corp.*, No. 22-CV-2606, 2023 WL 5979180, at *6 (E.D.N.Y. June 30, 2023) (citing NYLL § 195(3)). The statement must "contain[] certain information including the hours being compensated, the wages paid, and any deductions." *Fisher v. SD Prot. Inc.*, 948 F.3d 593, 598 n.3 (2d Cir. 2020) (citing NYLL § 195(3)). An employee who is not given these statements may "recover in a civil action damages of two hundred fifty dollars for each work day that the violations occurred or continue to occur, but not to exceed a total of five thousand dollars, together with costs and reasonable attorney's fees." NYLL § 198(1-d); *Fisher*, 948 F.3d at 598 n.3.

To recover for a wage statement violation in federal court, however, a plaintiff must demonstrate more than just a defendant's contravention of the wage statement provision because "in suits for damages plaintiffs cannot establish Article III standing by relying entirely on a statutory violation." *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*, 19 F.4th 58, 64 (2d Cir. 2021). "'Standing to sue is a doctrine' that 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'" *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 183–84 (2d Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). "[T]o establish standing, 'a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief.'" *Stafford*

*v. Int'l Bus. Machs. Corp.*, 78 F.4th 62, 67 (2d Cir. 2023) (alteration in original) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).  "An injury in fact must be 'particularized,' and it must be 'concrete.'"  *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 442 (2d Cir. 2022) (quoting *Spokeo*, 578 U.S. at 340).  As such, "a bare procedural violation, divorced from any concrete harm," does not "satisfy the injury-in-fact requirement of Article III."  *Spokeo*, 578 U.S. at 341.

"[S]tanding is required for subject matter jurisdiction."  *James v. Willis*, No. 21-501, 2022 WL 481812, at *1 (2d Cir. Feb. 17, 2022) (citing *Strubel v. Comenity Bank*, 842 F.3d 181, 187 (2d Cir. 2016)).  "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim."  *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 283 (2d Cir. 2023) (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)).

Plaintiffs lack Article III standing with respect to their wage statement claim.  Plaintiffs claim that "Defendants did not provide [Plaintiffs] with wage statements that reflected their hourly rates" or that "accurately reflected their hours worked and often did not reflect any hours worked." (Compl. ¶¶ 84–85.)  Although Plaintiffs alleged that "[t]he failure of Defendants to provide complete and accurate wage statements . . . in violation of NYLL § 195 was willful and repeated" and "deprived [Plaintiffs] of the appropriate wage statements," (*id.* ¶¶ 87–88), Plaintiffs have neither alleged any "concrete" or "particularized" injury, nor have they provided any evidence that they have suffered an injury or any "downstream consequences" resulting from Defendants' alleged failure, (*see* Pls.' 56.1 ¶¶ 118–123); *TransUnion*, 594 U.S. at 442 ("[T]he plaintiffs have identified no 'downstream consequences' from failing to receive the required information." (citation omitted)).  Plaintiffs have therefore failed to establish subject matter jurisdiction for their wage statement claims.  *See Chen v. Lilis 200 W. 57th Corp.*, No. 19-CV-7654, 2023 WL

2388728, at *8 (S.D.N.Y. Mar. 7, 2023) (denying summary judgment and dismissing without prejudice the plaintiff's recordkeeping violations of the NYLL "because he ha[d] not established a triable issue of fact as to any downstream consequences from failing to receive certain information regarding his wages as required by the NYLL"); *see also Lopez v. Martha's Cocina Mexicana, LLC*, No. 23-CV-2053, 2023 WL 9603828, at *12 (E.D.N.Y. Dec. 27, 2023) (recommending dismissal of the plaintiff's wage statement claim for lack of subject matter jurisdiction because he "failed to allege any facts about injuries that flowed from [the d]efendants' alleged [WTPA] violation" and "only allege[d] that he was not provided wage notices and wage statements, and that such failure violated the law"), *report and recommendation adopted by* No. 23-CV-2053 (E.D.N.Y. Jan. 30, 2024); *Guthrie v. Rainbow Fencing Inc.*, No. 21-CV-5929, 2023 WL 2206568, at *4–7 (E.D.N.Y. Feb. 24, 2023) (dismissing NYLL wage statement claim where the "[p]laintiff did not link any injury-in-fact that he personally experienced to [the d]efendants' failure to provide statutory notices under the NYLL"); *cf. Isayeva v. Diamond Braces*, No. 22-CV-4575, 2024 WL 1053349, at *17 (S.D.N.Y. Mar. 11, 2024) (finding that a class of plaintiffs had standing to bring NYLL wage statement claims because they sufficiently alleged injury arising out of the defendants' inaccurate reporting of the hours worked by the class as the "reporting obfuscated the fact of [the d]efendants' alleged time-shaving and hindered [the p]laintiffs' ability, at the time they were paid, to discover their underpayment and advocate for themselves"). Accordingly, the Court denies summary judgment and dismisses Plaintiffs' NYLL wage statement claim without prejudice for lack of subject matter jurisdiction.

> **d.   There is a genuine issue of material fact regarding whether NAPW and PDN were joint employers under the *Carter* formal control factors**

PDN argues that Judge Henry erred in finding that there were genuine issues of material fact as to each of the four factors under the formal control test for joint employment as

established by *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8 (2d Cir. 1984).  (PDN's Objs. 2–6.)
PDN argues that "Plaintiffs cannot establish that they were employed by PDN and thus summary
judgment in PDN's favor is appropriate."  (*Id.* at 1.)

Plaintiffs argue that Judge Henry did not err in denying PDN's motion for summary
judgment under the *Carter* formal control factors, and "[t]o the extent any modification to the
R&R should be made, the Court should grant summary judgment for Plaintiffs, finding [that]
PDN employed Plaintiffs."  (Pls.' Resp. 1, 7–9, 23–25.)

The FLSA creates liability for any "employer" who violates its terms.  *See, e.g.*, 29
U.S.C. § 207(a)(1).  Under the FLSA, an "employer" is defined broadly to include "any person
acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C.
§ 203(d); *see also id.* § 203(a) (defining "person" as "an individual, partnership, association,
corporation, business trust, legal representative, or any organized group of persons").  "Because
the statute defines employer in such broad terms, it offers little guidance on whether a given
individual is or is not an employer."  *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir.
1999).  In making that determination, a court should focus on "whether the alleged employer
possessed the power to control the workers in question, with an eye to the 'economic reality'
presented by the facts of each case."  *Id.* (citations omitted).

Because the "economic reality" of a relationship drives the analysis as to whether it
constitutes an employer-employee relationship for the purposes of the FLSA, the determination
must be made on a case-by-case basis in light of the totality of the circumstances and cannot rest
on "technical concepts."  *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013).  In
determining whether a defendant is an "employer," as defined in the statute, the Second Circuit
has identified four factors to consider, including, "whether the alleged employer (1) had the power
to hire and fire the employees, (2) supervised and controlled employee work schedules or

14

conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records."[8] *Id.* at 104–05 (quoting *Barfield v. N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 142 (2d Cir. 2008)); *see also Ocampo v. Brown & Appel, LLC*, No. 21-2579, 2022 WL 17684587, at *2 n.2 (2d Cir. Dec. 15, 2022) (quoting same).  These factors do not, however, "comprise a rigid rule for the identification of an FLSA employer," but rather provide a guideline "to ensure that the economic realities test mandated by the Supreme Court is sufficiently comprehensive and flexible to give proper effect to the broad language of the FLSA."  *Irizarry*, 722 F.3d at 105 (quoting *Barfield*, 537 F.3d at 143) (internal quotation marks omitted).  A district court is "free to consider any other factors it deems relevant to its assessment of the economic realities."  *Zheng v. Liberty Apparel Co.*, 355 F.3d 61, 71–72 (2d Cir. 2003).  Because a determination of joint employment is inherently "'fact-intensive,' awards of summary judgment on this issue, although sometimes appropriate, are rare."  *Greenawalt v. AT&T Mobility LLC*, 642 F. App'x 36, 37 (2d Cir. 2016) (citing *Barfield*, 537 F.3d at 143–44).

### 1.   Hiring and firing

PDN argues that Judge Henry erred in finding that "Plaintiffs presented more than a 'scintilla' of evidence that PDN had power to hire and fire NAPW employees" when "[t]he only evidence submitted by Plaintiffs was a letter dated September 25, 2014 suggesting that all

---

[8] PDN does not object to Judge Henry's "determination that the analysis of PDN's status as an 'employer' under the FLSA is coextensive with its status under the NYLL," (PDN's Objs. 3 n.2), which is consistent with how other courts in this Circuit analyze employer status under the FLSA and the NYLL.  *See, e.g.*, *Ramos v. Guaba Deli Grocery Corp.*, No. 20-CV-4904, 2021 WL 5563714, at *5 (S.D.N.Y. Nov. 29, 2021) (quoting *Olvera v. Bareburger Grp. LLC*, 73 F. Supp. 3d 201, 206 (S.D.N.Y. 2014)); *Mahoney v. Amekk Corp.*, No. 14-CV-4131, 2016 WL 6585810, at *9 (E.D.N.Y. Sept. 30, 2016) (collecting cases holding that the FLSA and the NYLL are interpreted consistently with one another on the question of employer status).

NAPW employees would be hired by PDN *en masse*."[9]  (PDN's Objs. 3–4; *see also* Sept. 2014 PDN Letter 16.)

Plaintiffs argue that the September 2014 PDN Letter is "very compelling evidence of PDN's authority to hire and fire NAPW sales representatives, [and] it is also far from the only evidence in the record."  (Pls.' Resp. 23.)  In support, Plaintiffs cite to four pieces of evidence not addressed by Judge Henry in the R&R that they argue establishes that "PDN maintained and exercised its power to hire and fire NAPW sales representatives throughout the entire relevant period."[10]  (*Id.* at 7.)  First, Plaintiffs cite to a July 20, 2015 letter from Chris Wesser, the Executive Vice President, General Counsel, and Secretary for PDN, to NAPW sales representatives in New York explaining that, "The PDN Executive Team has agreed to freeze any expansion plans and keep the number of sales reps where it is today."  (*Id.* (emphasis omitted) (citing Letter from Chris Wesser dated July 20, 2015 ("July 2015 Wesser Letter"), annexed to Mortillaro Decl. as Ex. 5).)  Second, they cite to PDN's SEC filing, which shows that "PDN closed NAPW's Los Angeles office in the fourth quarter of 2015 and reduced the number of representatives from 105 to 57 to ensure profitability."  (*Id.* (citing PDN's 2015 SEC 10-K Form 30, annexed to Pls.' Mot. as Ex. 16, Docket Entry No. 113-16).)  Third, Plaintiffs cite to the testimony of Joseph Bzdyl, PDN's Executive Vice President, that "he personally traveled to

---

[9]  (Letter from Jim Kirsch, Matt Proman & Star Jones dated Sept. 25, 2014 ("September 2014 PDN Letter"), annexed to Mortillaro Decl. as Ex. 3.)

[10]  While Judge Henry did not cite these facts in the R&R, Plaintiffs presented this evidence to Judge Henry, and thus the Court can consider the evidence.  *Cf. Gov. Emps. Ins. Co. v. Grody*, No. 22-CV-6187, 2023 WL 6307340, at *2 (E.D.N.Y. Sept. 28, 2023) ("Even on *de novo* review, . . . the Court 'will ordinarily refuse to consider arguments, case law, and/or evidentiary material which could have been, but [were] not, presented to the Magistrate Judge in the first instance.'" (second alteration in original) (quoting *Haynes v. Quality Mkts.*, No. 02-CV-250, 2003 WL 23610575, at *3 (E.D.N.Y. Sept. 22, 2003))); *Saada v. Golan*, No. 18-CV-5292, 2023 WL 1993538, at *2 (E.D.N.Y. Feb. 13, 2023) (stating the same).

NAPW's New York office and terminated 30 to 40 NAPW sales representatives in 2017" and "terminated NAPW sales representatives in 2019 remotely" at "the direction of PDN's CEO." (*Id.* at 7 (citing Dep. of Joseph Bzdyl ("Bzdyl Dep.") 23:1–25:7, annexed to Pls.' Mot. as Ex. 13, Docket Entry No. 113-13).)  Finally, they cite to Bzdyl's testimony that he was "nominated by the former CEO [of PDN] to oversee certain aspects and ensure hiring was in line with strategies" because "[t]here were no remaining senior leaders at NAPW to conduct and manage those teams in 2018."  (*Id.* at 8 (citing Bzdyl Dep. 57:1–11).)

As to PDN's "power to hire and fire" Plaintiffs, the undisputed evidence shows that PDN had a minimal role in an NAPW employee's hiring but did retain discretion to fire NAPW employees.  NAPW originally reviewed at least three Plaintiffs' job applications and hired these Plaintiffs before the merger, (*see* Pls.' 56.1 Resp. ¶¶ 28–30, 34–36), but PDN "formally hire[d] each [NAPW sales representative] as a PDN employee" post-merger in 2014, (Memo. to All Employees ("Merger Memo"), annexed to Mortillaro Decl. as Ex. 4; *see also* Sept. 2014 PDN Letter ("An immediate and important change is that you now work for a publicly held company[,] Professional Diversity Network . . . .")), and "[t]he PDN Executive Team . . . agreed to freeze any expansion plans and keep the number of sales reps where it [currently was]" in 2015, (July 2015 Wesser Letter).  In addition, Bzdyl testified that he was instructed to "oversee certain aspects and ensure [NAPW] hiring was in line with strategies."  (Bzdyl Dep. 57:6–11.)  This evidence indicates that PDN had input in large-scale, but not day-to-day, hiring, such as accepting applications, conducting interviews, and making employment offers to NAPW candidates.  *See, e.g.*, *Gil v. Pizzarotti, LLC*, No. 19-CV-3497, 2021 WL 1178027, at *6 (S.D.N.Y. Mar. 29, 2021) (collecting cases showing that "[m]ore direct involvement in the hiring process is necessary for the hiring factor to weigh in favor of formal control"); *Jean-Louis v. Metro. Cable Commc'ns, Inc.*, 838 F. Supp. 2d 111, 123 (S.D.N.Y. 2011) ("In terms of hiring,

the undisputed evidence shows that [the alleged joint employer] does not receive applications from [the primary employer's] technicians; interview or review applicants; inform applicants that they have been hired; or provide new hires with employment forms."); *cf. Irizarry*, 722 F.3d at 114 (finding first factor satisfied based on evidence that the defendant actually hired at least one manager, interviewed a potential manager, promoted at least two employees, and was notified of firings).

However, Plaintiffs have offered evidence to show that PDN and its executives were involved in the termination of dozens of NAPW sales representatives in 2015, 2017, and 2019, which supports Plaintiffs' contention that PDN had the power to fire Plaintiffs. For example, Bzdyl testified that he traveled to NAPW's New York office in 2017 to "conduct[] a reduction in force" of approximately 30 to 40 NAPW employees at the instruction of PDN's CEO. (Bzdyl Dep. 20:21–18, 23:1–25:7 ("Q: Why was it that you were responsible for laying the people off, informing them?  A: I was directed to by the CEO . . . [o]f PDN, following the resignation of Kathy Butkevich.")); *cf. Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 423 (S.D.N.Y. 2017) (finding that the alleged joint employer did not have the power to fire employees when the plaintiffs "were informed of their termination by a [primary employer's] employee," "no one from [the alleged joint employer] was present at the time," and "neither [plaintiff] ever discussed the termination with anyone from [the alleged joint employer]"); *Franco v. Ideal Mortg. Bankers, Ltd.*, No. 07-CV-3956, 2011 WL 317971, at *6 (E.D.N.Y. Jan. 28, 2011) (noting that the record strongly suggested that the president and majority owner of the defendant entity had the power to fire employees but concluding that this factor was undecided because "nothing in the record indicate[d] that [his] power extended to lower-level employees, such as loan officers"). Accordingly, this factor remains neutral as to whether PDN had the "power to hire and fire" NAPW employees.

## 2.   Supervision and control

PDN argues that Judge Henry erred by (1) finding that the "record is . . . unclear whether Plaintiffs report to only NAPW supervisors," (PDN's Objs. 4 (quoting R&R 19)), and (2) placing the burden on "PDN to establish that it was not Plaintiffs' employer," (*id.*).  In support of its first argument, PDN argues that testimony from NAPW established that Plaintiffs' work schedules were established by NAPW sales managers and testimony from Plaintiffs established that they worked at NAPW offices or from home with equipment supplied by NAPW.  (*Id.* (citing R&R 18–19).)  In support of its second argument, PDN argues that, by finding that "PDN's failure to cite to any evidence establishing that one plaintiff's supervisor was [an NAPW] . . . employee created a factual issue," (*id.* (quoting R&R 19)), Judge Henry ignored that "[i]t is Plaintiffs' burden to establish that PDN is their employer," and the "absence of any evidence from which Plaintiffs can establish such does not create a factual issue, but instead renders Plaintiff unable to sustain its burden with respect to this factor."  (*Id.*)

Plaintiffs argue that PDN supervised and controlled Plaintiffs because (1) PDN admitted in its answer that it "maintained control over Bayne's work," (Pls.' Resp. 23), which they argue is a "binding judicial admission[]," (*id.* at 3 (citations omitted)); (2) "Proman, in his capacity as an executive officer of PDN, is described as having a 'hands-on' approach to NAPW, including 'his day-to-day operational leadership of NAPW's sales, technology and marketing functions,'" (*id.* at 23); (3) PDN required NAPW and its employees to adopt PDN policies, (*id.* at 23–24 (citations omitted)); (4) "all essential terms of Plaintiffs' employment were set forth in the 2018 'Sales Associate Commission Agreement' entered into between NAPW sales representatives and PDN," which included "Plaintiffs' positions and employment classifications, duties and responsibilities, expected sales results, commission structure, and termination policies," (*id.* at 24); and (5) PDN and its executives exercised control over NAPW employees by (i) "overseeing

business and operations at NAPW," (ii) encouraging NAPW sales representatives "to discuss various workplace issues, including, but not limited to, sales quotas, issues with the [Customer Relationship Management ("CRM")] system, the method for distributing sales leads, and the compensation structure," (iii) "setting the NAPW holiday schedule," (iv) "issu[ing] healthcare coverage," and (v) "overseeing NAPW's '[Personal Time Off ("PTO")] Policy,'" (*id.* at 24).

"Joint employer status may be found even where supervision and control are 'exercised only occasionally." *Gil*, 2021 WL 1178027, at *8 (first quoting *RSR*, 172 F.3d at 139; and then citing *Barfield*, 537 F.3d at 147); *see also Barfield*, 537 F.3d at 147 ("[T]he law does not require an employer 'to look over his workers' shoulders every day in order to exercise control.'" (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988))). "The fact that the [primary employer] may have exercised 'ultimate' authority in . . . areas [of hiring, firing, and conditions of employment] does not alter the fact that [the alleged joint employer] also exercised some authority which helps establish the economic reality of its status as a joint employer." *Barfield*, 537 F.3d at 144 (first citing *Carter*, 735 F.2d at 12; and then citing *RSR*, 172 F.3d at 139). This "shared authority" can be established, for example, by showing that a plaintiff was required "to complete various employment-related forms exclusively for [the alleged joint employer]," *Short v. Churchill Benefit Corp.*, No. 14-CV-4561, 2016 WL 8711349, at *19 (E.D.N.Y. Apr. 8, 2016), or by showing that the alleged joint employer could directly or indirectly affect the primary employer's policies or was in charge of implementing such policies, *see Gordon v. Gen. Prop. Mgmt. Assocs., Inc.*, 496 F. Supp. 3d 830, 840 (S.D.N.Y. 2020).

Plaintiffs present evidence that creates a genuine issue of material fact as to whether NAPW and PDN exercised such "shared authority." First, it is undisputed that PDN required NAPW sales representatives, at the beginning of their employment, to "receive[] and sign[]" PDN policies, including PDN's insider trading policy, code of ethics, sexual harassment policy,

and dispute resolution program.  (2015 NAPW Sales Personnel Polices 1 & n.1, annexed to Pls.'

Opp'n as Ex. O, Docket Entry No. 117-17; *see also* Sept. 2014 PDN Letter; Merger Memo); *see,*

*e.g.*, *Short*, 2016 WL 8711349, at *19.  Second, PDN appears to be able to directly or indirectly

affect NAPW's policies, including PTO policies,[11] (Jan. 2019 Cummins E-mail), and NAPW's

holiday schedule, (*see* 2015 NAPW Sales Personnel Policies 3 n.2; *see also* Bzdyl Dep. 103:13–

20 (noting that "shortly after PDN's acquisition of NAPW," "[t]here was an attempt made to

align various policies and procedures, especially holidays, paid holidays, across all companies in

the PDN umbrella")); *see, e.g.*, *Gordon*, 496 F. Supp. 3d at 840.  In addition, PDN was

responsible for NAPW's employees' 401K Plan, (Farris PDN 401K Plan, annexed to Farris Decl.

as Ex. 3), and healthcare coverage,[12] (Defs.' 56.1 Resp. ¶ 44), suggesting that PDN was

responsible for implementing certain NAPW policies and employee benefits, *see Gordon*, 496 F.

Supp. 3d at 840.  Third, there is evidence that at least some PDN executives exercised control

over NAPW and its employees.  (Defs.' Answer ¶ 19 ("Mat[t]hew Proman [PDN's Executive

Vice President, COO, and Board of Directors member post-merger] operated NAPW and [its

predecessor] at certain times before and after the merger."); PDN's 2014 SEC 10-K Form 26,

annexed to Pls.' Mot. as Ex. 15, Docket Entry No. 113-15 ("Mr. Proman's 'hands-on,'

entrepreneurial approach at [PDN's] NAPW subsidiary includes his day-to-day operational

leadership of NAPW's sales, technology and marketing functions."); Mortillaro Decl. ¶¶ 22–27

("[Plaintiff] complained to Barry Feierstein [PDN's Board of Directors member] and Chris

---

[11]  (E-mail from Katie Cummins, HR Business Partner, PDN to IAW Employees dated Jan. 28, 2019 ("January 2019 Cummins E-mail"), annexed to Dotson Reply Decl. as Ex. 1.)

[12]  PDN argues that Plaintiffs' assertion that PDN "issued healthcare coverage to NAPW's sales representatives," "is incomplete and factually inaccurate" because "PDN contracted with a third party carrier to align coverages across the entire corporate entity for purposes of improving insurance rates."  (Defs.' 56.1 Resp. ¶ 44.)  Accepting this as true, PDN, not NAPW, was responsible for contracting with the third-party carrier to provide healthcare coverage.

Wesser [PDN's Executive Vice President, General Counsel, and Secretary] on many occasions about sales quotas, lead distribution, the CRM system not working, the compensation structure, and about working harder but making less money."); E-mail from Sabina Mortillaro to Barry Feierstein dated Aug. 14, 2015, annexed to Mortillaro Decl. as Ex. 6.)  Fourth, PDN's post-rebrand sales commission agreement template is an agreement exclusively between PDN and NAPW sales representatives that explains an employee's position and employment classification, duties and responsibilities, and compensation structure.  (2018 Sales Assoc. Comm'n Agreement, annexed to Pls.' Mot. as Ex. 23, Docket Entry No. 113-23; *see also* Bzdyl Dep. 104:3–105:20 (noting that "[e]ven though the sales reps were employees [of] NAPW, per the terms of th[e] agreement, it does say PDN has entered into the agreement," but acknowledging that he "do[es]n't know if any of the[] documents were signed by somebody at PDN").)  Finally, at least with respect to Bayne, PDN admitted in its answer that "Defendants maintained control over Bayne's work," (Defs.' Answer ¶ 60), which is binding on the Court, *see Gibbs ex rel. Est. of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 578 (2d Cir. 2006).

PDN presents undisputed evidence that some Plaintiffs worked from NAPW locations, participated in trainings conducted by NAPW, complied with NAPW's time-sheet procedures, and reported to NAPW supervisors.  (*See* Pls.' 56.1 Resp. ¶¶ 41–45, 47–51, 56, 58, 60.)  However, Plaintiffs identify various issues regarding PDN's evidence.  (*See, e.g.*, *id.* ¶ 46 (plaintiff was never provided any training by NAPW or PDN); *id.* ¶ 63 (plaintiff was unable to identify her supervisor); *id.* ¶ 65 (plaintiff identified supervisor as "Maria Nania," without specifying if that supervisor was a PDN or NAPW supervisor).)  In light of these factual disputes and the evidence of "shared authority" between NAPW and PDN, the Court finds that there are genuine issues of material fact regarding whether PDN supervised and controlled NAPW employees.

### 3.   Determining the rate and method of payment

PDN argues that Judge Henry ignored "[t]he real question" under this factor, which "is whether PDN had 'authority to sign paychecks' on behalf of NAPW."  (PDN's Objs. 5 (quoting *Irizarry*, 722 F.3d at 115).)  In addition, PDN argues that "Plaintiff again failed to point out any evidence at all establishing that PDN — and not NAPW — determined the *rate* and *method* of payment."  (*Id.* (citing R&R 19).)  In support, it argues that the fact that "PDN's CFO's name appeared on some NAPW paychecks is immaterial" and "[a]n issue of fact as to an immaterial fact cannot defeat summary judgment."  (*Id.* (first citing *Zhang v. Shun Lee Palace Rest., Inc.*, No. 17-CV-840, 2021 WL 634717, at *7 (S.D.N.Y. Feb. 16, 2021); and then citing *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir. 2004)).)

Plaintiffs argue that this factor weighs in their favor because (1) "PDN was the only corporate party to the 2018 NAPW sales commission agreement, which set forth Plaintiffs' base salary and commissions," (2) "PDN modified Plaintiffs' commission structure and streamlined sales leads," (3) "Plaintiffs' paystubs and W-2 forms list NAPW as the corporate entity issuing the checks but [list] PDN's address in Chicago," and (4) "PDN's CFO David Mecklenburger signed checks issued by NAPW to NAPW sales representatives."  (Pls.' Resp. 24.)

Plaintiffs present evidence that creates a genuine issue of material fact as to whether PDN determined the rate and method of payment and whether PDN had the authority to sign NAPW paychecks.  *See Barfield*, 537 F.3d at 142; *RSR*, 172 F.3d at 140 ("The key question [under the third factor] is whether [the defendant] had the authority to sign paychecks throughout the relevant period.").  First, Plaintiffs submit a check issued in 2015 on behalf of NAPW and signed by PDN's CFO at the time, (Hoffman Check dated May 1, 2015, annexed to Hoffman Decl. as Ex. 1; Defs.' 56.1 Resp. ¶ 43), which suggests that, for at least some period of time, PDN had authority to sign paychecks to NAPW employees.  Second, some of Plaintiffs' post-merger

paystubs and tax forms list "NAPW Inc." as the corporate entity issuing paychecks but list

PDN's Chicago corporate address.  (*Compare* Farris Check dated Aug. 2, 2013, at 6, annexed to

Farris Decl. as Ex. 1 (listing NAPW's New York address); *with* Farris Check dated Dec. 30,

2016, at 8, annexed to Farris Decl. as Ex. 1 (listing PDN's Chicago address); Bourassa 2016 W-2

Wage & Tax Stmt. (listing PDN's Chicago address), annexed to PDN's Mot. as Ex. O, Docket

Entry No. 116-16; *but see* Hoffman Direct Deposit Voucher dated Jan. 12, 2018, annexed to

Hoffman Decl. as Ex. 1 (listing NAPW's New York address).)  These paystubs and tax forms

pre-date NAPW's move to PDN's Chicago office, (Defs.' 56.1 Resp. ¶¶ 74–75), which, as Judge

Henry noted, "raises questions as to who was processing payments for Plaintiffs," (R&R 19).

Third, although unexecuted, the Sales Associate Commission Agreement lists sales

representatives' base salary as "$500 per week," (Sales Assoc. Comm'n Agreement 2), and is

consistent with Plaintiffs' actual base salary, (Defs.' 56.1 Resp. ¶¶ 76–77), which a reasonable

juror could interpret as evidence supporting that PDN determined NAPW sales representatives'

rates of pay.  *Cf. Monzano-Moreno v. Libqual Fence Co.*, No. 18-CV-161, 2021 WL 730663, at

*12 (E.D.N.Y. Feb. 5, 2021) ("The fact that [the p]laintiffs' rate and method of payment differed

from [the alleged joint employers'] employees further supports the finding that [the primary

employer] . . . determined [the p]laintiffs' rate of pay and method of payment."), *report and*

*recommendation adopted by* 2021 WL 688295 (E.D.N.Y. Feb. 23, 2021).  Accordingly, genuine

issues of material fact exist as to whether PDN determined the rate and method of payment for

NAPW employees.

### 4.   Maintaining employment records

PDN argues that (1) Plaintiffs "have no evidence that PDN maintained any records for

NAPW, much less the 'most relevant' ones which includes those documents concerning 'hours

worked,'" (PDN's Objs. 6 (citations omitted)), and (2) Judge Henry "wrongly credited two

pieces of evidence to create a factual issue on this factor: [i] that 'NAPW did not always maintain its own employment records' and [ii] that NAPW materials were shipped to its new office in Chicago in 2018," (*id.* at 5 (quoting R&R 19–20)).  Regarding the first piece of evidence, PDN argues that Plaintiffs' citation to an email sent by an "HR Business Partner" with a PDN email address to NAPW employees regarding PTO policy "says nothing about whether PDN maintained employment records" and "merely suggest[s] that a policy specific to NAPW was sent from a PDN email address."  (*Id.* (citations omitted).)  Regarding the second piece of evidence, PDN argues that "the location of the records (in any case at NAPW's offices) says nothing about whether *PDN* maintained the records instead of NAPW."  (*Id.* at 6.)

Plaintiffs argue that PDN maintained NAPW's employment records because (1) NAPW "boxed and shipped" employee files from the former NAPW Garden City office to PDN's offices in Chicago, (2) "[Bzdyl] testified that PDN and NAPW shared accounting," and (3) "PDN and NAPW shared platforms," such as employee portals for storing employee records and cloud-based hosting platforms for the old CRM system, which was paid for and managed by PDN.  (Pls.' Resp. 25.)

Plaintiffs present evidence that creates a genuine issue of material fact as to whether PDN maintained employment records.  *See Barfield*, 537 F.3d at 144 (noting that the "employment records on the matter most relevant to overtime obligations under the FLSA" are those relating to "hours worked").  It is undisputed that neither NAPW nor PDN maintained records that reflect the hours worked by Plaintiffs prior to June 2015.  (Defs.' 56.1 Resp. ¶ 81; *see also id.* ¶ 93 ("As explained, as NAPW transitioned from one system to another, those records were not retained.").)  PDN argues that NAPW "maintained their time records and employment files, [and] issued their W-2 wage statements," (Defs.' Opp'n 14), and produced "records reflecting time records for [NAPW] sales representative[s] for the period of June 2015 to July 2019," (Defs.' 56.1 Resp. ¶ 92).  However, as discussed above, various paystubs and tax forms named

"NAPW" as the relevant corporate entity but listed PDN's Chicago corporate address years

before NAPW vacated its New York office and "boxed and shipped" employee files to Chicago.

In addition, although NAPW and PDN maintained separate payroll accounts with the same third-

party, (*see* Bzdyl Dep. 148:16–21), Plaintiffs present evidence that PDN's and NAPW's payroll

operations were, at least partially, intertwined as Bzdyl was the administrator on both NAPW's

and PDN's payroll accounts since late 2019, when the third-party contractor who performed

work for both NAPW and PDN departed, (*id.* at 149:1–24).  In light of these factual disputes, the

Court finds that genuine issues of material fact remain as to whether PDN maintained NAPW's

employees' records.

Consistent with Judge Henry's finding, there are genuine disputes as to material facts

regarding whether PDN exercised formal control over Plaintiffs.  (*See* R&R 20.)  Accordingly,

the Court finds that the objections by PDN are without merit.[13]

### III.  Conclusion

For the reasons stated above, the Court (1) grants Plaintiffs' motion as to (i) NAPW's

liability for unpaid overtime wages under the FLSA and the NYLL, (ii) NAPW's willful

violation of the FLSA and the NYLL, (iii) liquidated damages, and (iv) prejudgment interest; (2)

dismisses without prejudice Plaintiffs' NYLL wage statement claim for lack of subject matter

---

[13]  PDN objected to Judge Henry's findings that genuine issues of material fact existed as to whether PDN was Plaintiffs' employer under each of three tests: (i) the formal control test, *see Carter*, 735 F.2d at 12 (listing four factors); (ii) the functional control test, *see Zheng*, 355 F.3d at 72 (listing six factors); and (iii) the single-enterprise test.  (PDN's Objs.)  Because the Court finds genuine issues of material fact exist as to whether NAPW and PDN were joint employers under the formal control test, and satisfying this test "is sufficient, but not necessary, to show joint employment," *Greenawalt*, 642 F. App'x at 37 (citing *Zheng*, 355 F.3d at 71), the Court denies Plaintiffs' and PDN's motions for summary judgment on the issue of PDN's status as Plaintiffs' employer under the FLSA and the NYLL.  Accordingly, the Court declines to address PDN's additional objections regarding the functional control or single-enterprise test.  (PDN's Objs. 6–15.)

jurisdiction, and (3) denies Plaintiffs' motion as to PDN's liability for all remaining claims.  The

Court also denies PDN's motion for summary judgment.

Dated:  March 25, 2024
          Brooklyn, New York

                              SO ORDERED:


                              _____s/ MKB_____
                              MARGO K. BRODIE
                              United States District Judge